[No. B025565. Second Dist., Div. Three. July 12, 1988.]

JACK McCOLLUM et al., Plaintiffs and Appellants, v. CBS, INC., et al., Defendants and Respondents.

COUNSEL

Anderson, Parkinson, Weinberg & Miller, Thomas T. Anderson, De Goff & Sherman, Victoria J. De Goff and Richard I. Sherman for Plaintiffs and Appellants.

Wyman, Bautzer, Christensen, Kuchel & Silbert, Howard L. Weitzman, Michael J. O'Connor, Allison Weiner Fechter, O'Melveny & Myers, William W. Vaughn and Douglas W. Abendroth for Defendants and Respondents.

Fred J. Hiestand and Paul N. Halvonik as Amici Curiae.

OPINION

CROSKEY, J.—Plaintiffs, Jack McCollum, Geraldine Lugenbuehl, Estate of John Daniel McCollum, Jack McCollum, administrator (hereinafter plaintiffs) appeal from an order of dismissal following the sustaining of a demurrer without leave to amend. The defendants John "Ozzy" Osbourne (Osbourne), CBS Records and CBS, Incorporated (hereinafter collectively CBS), Jet Records, Bob Daisley, Randy Rhoads, Essex Music International, Ltd., and Essex Music International Incorporated,[1] composed, performed,

[1] The defendants Bob Daisley and Randy Rhoads (composers and musicians), Essex Music International, Ltd., and Essex Music International, Incorporated (owners of the publication rights to the record albums which are the subject of this action) and Jet Records (a distributor of the record albums) did not appear herein. The record does not disclose whether or not

produced and distributed certain recorded music which plaintiffs claim proximately resulted in the suicide of their decedent. ██ As we conclude that plaintiffs' pleading (1) fails to allege any basis for overcoming the bar of the First Amendment's guarantee of free speech and expression[2] and, in any event, (2) fails to allege sufficient facts to show any intentional or negligent invasion of plaintiffs' rights, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 26, 1984, the plaintiffs' decedent, John Daniel McCollum (John), shot and killed himself while lying on his bed listening to Osbourne's recorded music. John was 19 years old at the time, and had a problem with alcohol abuse as well as serious emotional problems. Alleging that Osbourne's music was a proximate cause of John's suicide, plaintiffs filed suit against all of the named defendants.

The original complaint was filed on October 25, 1985, and, before an appearance by any defendant, was followed by the first amended complaint on December 4, 1985. Plaintiffs alleged claims which were based on theories of negligence, product liability and intentional misconduct. On August 7, 1986, the court sustained general demurrers to all causes of action without leave to amend, but granted plaintiffs permission to file, within 60 days, a motion for leave to file a second amended complaint. That motion was made and, on December 19, 1986, was denied. On the same date, the court signed the order of dismissal (based on its ruling of Aug. 7, 1986) from which the plaintiffs now appeal.

In the trial court's view, the First Amendment was an absolute bar to plaintiffs' claims. Nonetheless, the court did invite plaintiffs to seek leave to file a further pleading to see if that hurdle could be overcome. A proposed second amended complaint was submitted and the court made its final decision based on those allegations. For that reason, we here treat such proposed pleading as the operative one before us and assume that it states plaintiffs' case in its strongest light. In accordance with well-settled principles, we likewise assume those allegations to be true. (*Baldwin* v. *Zoradi*

they were ever served. The attack on plaintiffs' pleading was made by, and the order of dismissal issued only in favor of, the defendants Osbourne and CBS. Unless the context otherwise indicates, the term "defendants" shall hereafter refer just to these defendants.

[2] This refers to the First Amendment to the United States Constitution. The California Constitution has a similar provision. "Article I, section 2 of the state Constitution constitutes '[a] protective provision more definitive and inclusive than the First Amendment.' (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]; *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908 [153 Cal.Rptr. 854, 592 P.2d 341].) State action violative of the First Amendment is, therefore, a fortiori violative of the state Constitution. For convenience, we use the term 'First Amendment' in this opinion as a shorthand identification of the free speech guarantees contained in both federal and state Constitutions." (*Bill* v. *Superior Court* (1982) 137 Cal.App.3d 1002, 1007, fn. 1 [187 Cal.Rptr. 625].)

(1981) 123 Cal.App.3d 275, 278 [176 Cal.Rptr. 809]; *Droz v. Pacific National Ins. Co.* (1982) 138 Cal.App.3d 181, 182 [188 Cal.Rptr. 10].) They reflect the following facts.

On Friday night, October 26, 1984, John listened over and over again to certain music recorded by Osbourne. He listened repeatedly to side one of an album called, "Blizzard of Oz" and side two of an album called, "Diary of a Madman." These albums were found the next morning stacked on the turntable of the family stereo in the living room. John preferred to listen there because the sound was more intense. However, he had gone into his bedroom and was using a set of headphones to listen to the final side of the two-record album, "Speak of the Devil" when he placed a .22-caliber handgun next to his right temple and took his own life.[3] When he was found the next morning he was still wearing his headphones and the stereo was still running with the arm and needle riding in the center of the revolving record.

Plaintiffs allege that Osbourne is well known as the "mad man" of rock and roll and has become a cult figure. The words and music of his songs and even the album covers for his records seem to demonstrate a preoccupation with unusual, antisocial and even bizarre attitudes and beliefs often emphasizing such things as satanic worship or emulation, the mocking of religious beliefs and death. The message he has often conveyed is that life is filled with nothing but despair and hopelessness and suicide is not only acceptable, but desirable.[4] Plaintiffs further allege that all of the defendants, through their efforts with the media, press releases and the promotion of Osbourne's records, have sought to cultivate this image and to profit from it.

---

[3] Although a principal thrust of plaintiffs' claims is that the lyrics of Osbourne's music incited John to commit suicide, the pleading focuses on the lyrics of the two albums found on the family stereo ("Blizzard of Oz" and "Diary of a Madman") and expresses no criticism, or even discussion, of any of the songs contained in the album, "Speak of the Devil" to which John was actually listening when he took his life. Moreover, the plaintiffs' pleading does not disclose the actual or even estimated interval between the time John last listened to the records on the family stereo and when he went to his bedroom to listen to "Speak of the Devil."

[4] It is relevant here to note that this is a theme often seen in literature and music. As the defendant CBS stated in its brief, the philosophical proposition that life is intolerable and suicide preferable has been frequently expressed. Illustrations cited by CBS include such recognized works as "Hamlet's 'to be or not to be' soliloquy, in which he lists human sufferings and declares that suicide is preferable to life [Shakespeare, *Hamlet,* Act III, Scene 1]; [ ] the sixteen suicides in Shakespearian drama alone; [ ] Tolstoy's novel, *Anna Karenina,* in which Anna, concluding life and love are a 'stupid illusion' and suicide the only way out, throws herself under a train; [ ] Sylvia Plath's autobiographical *The Belljar,* in which she presents a passionate, reasoned defense of her own 'rational' suicide; [ ] Arthur Miller's Pulitzer prize-winning play, *Death of a Salesman,* where Willy Loman, confronting failure of his dreams, defends his planned suicide as a 'courageous' way finally to achieve something and 'takes more guts than to stand the rest of . . . life ringing up zero . . .'; [ ] the operas of Puccini, Menotti and Verdi [Aida]; [and] [ ] the popular theme from the award-winning movie and later television show 'M*A*S*H', *'Suicide is Painless'. . . .'*"

*Osbourne in his music sought to appeal to an audience which included troubled adolescents and young adults who were having a difficult time during this transition period of their life;* plaintiffs allege that this specific target group was extremely susceptible to the external influence and directions from a cult figure such as Osbourne who had become a role model and leader for many of them. Osbourne and CBS knew that many of the members of such group were trying to cope with issues involving self-identity, alienation, spiritual confusion and even substance abuse.

Plaintiffs allege that a "special relationship" of kinship existed between Osbourne and his avid fans. This relationship was underscored and characterized by the personal manner in which the lyrics were directed and disseminated to the listeners. He often sings in the first person about himself and about what may be some of the listener's problems, directly addressing the listener as "you." That is, a listener could feel that Osbourne was talking directly to him as he listened to the music.

One of the songs which John had been listening to on the family stereo *before* he went to his bedroom was called "Suicide Solution" which, plaintiffs allege, preaches that "suicide is the only way out."[5] Included in a 28-

---

[5] Part of plaintiffs' argument is that Osbourne's music has a cumulative impact on the susceptible listener. For example, plaintiffs, in their brief, describe side one of the album "Blizzard of Oz," which concludes with the "Suicide Solution," as consisting "of a progression of songs which lead down the path of emptiness to suicide." The first song, "I Don't Know," reflects chaos and confusion in life. The second song, "Crazy Train," suggests that insanity is the inevitable result of the inability to resolve psychological conflict or to explain life's contradictions. It ends without hope. They are followed by "Goodbye to Romance," which suggests that the only way to be free is to cut one's ties to the past. The last song, "Suicide Solution" preaches that "suicide is the only way out" for a person who is involved in excessive drinking:

> "Wine is fine but whiskey's quicker
> Suicide is slow with liquor
> Take a bottle drown your sorrows
> Then it floods away tomorrows
>
> "Evil thoughts and evil doings
> Cold, alone you hand in ruins
> Thought that you'd escape the reaper
> You can't escape the Master Keeper
>
> "Cause you feel life's unreal and you're living a lie
> Such a shame who's to blame and you're wondering why
> Then you ask from your cask is there life after birth
> What you sow can mean Hell on this earth
>
> "Now you live inside a bottle
> The reaper's travelling at full throttle
>
> "It's catching you but you don't see
> The reaper is you and the reaper is me

second instrumental break in the song are some "masked" lyrics (which are not included in the lyrics printed on the album cover):

> "Ah know people
> You really know where it's at
> You got it
> Why try, why try
> Get the gun and try it
> Shoot, shoot, shoot" (this line
> was repeated for about 10 seconds).

These lyrics are sung at one and one-half times the normal rate of speech and (in the words of plaintiffs' allegations) "are not immediately intelligible. They are perceptible enough to be heard and understood when the listener concentrates on the music and lyrics being played during this 28-second interval." In addition to the lyrics, plaintiffs also allege that Osbourne's music utilizes a strong, pounding and driving rhythm and, in at least one instance,[6] a "hemisync" process of sound waves which impact the listener's mental state.

Following these general allegations, plaintiffs allege that the defendants knew, or should have known, that it was foreseeable that the music, lyrics and hemisync tones of Osbourne's music would influence the emotions and behavior of individual listeners such as John who, because of their emotional instability, were peculiarly susceptible to such music, lyrics and tones and that such individuals might be influenced to act in a manner destructive to their person or body. Plaintiffs further allege that defendants negligently disseminated Osbourne's music to the public and thereby (1) aided, advised or encouraged John to commit suicide (count I) or (2) created "an uncontrollable impulse" in him to commit suicide (count II); and that John, as a proximate result of listening to such music did commit suicide on October 26, 1984.

In the remaining two counts, plaintiffs allege, respectively, that defendants' conduct constituted (1) an incitement of John to commit suicide

---

> "Breaking law, knocking doors
> But there's no one at home
> Made your bed, rest your head
> But you lie there and moan
> Where to hide, Suicide is the only way out
> Don't you know what it's really about."

[6] That is, during the aforesaid 28-second instrumental break of the song, "Suicide Solution."

(count III) and (2) an intentional aiding, advising or encouraging of suicide in violation of Penal Code section 401 (count IV). In all four counts plaintiffs allege that defendants acted maliciously and oppressively and thus are liable for punitive damages.

## CONTENTS OF THE PARTIES

Plaintiffs argue that Osbourne's music and lyrics were the proximate cause of John's suicide and are not entitled to protection under the First Amendment. They seek recovery here on three separate theories. They claim that Osbourne and CBS (1) were negligent in the dissemination of Osbourne's recorded music, (2) intentionally disseminated that music with knowledge that it would produce an uncontrollable impulse to self-destruction in persons like John and (3) intentionally aided, advised or encouraged John's suicide in violation of Penal Code section 401, thus giving plaintiffs, as members of a group intended to be protected by that statute, a right of action for civil damages.

Defendants' initial and primary response is that plaintiffs' entire action, irrespective of the theory of recovery, is barred by the First Amendment's guarantee of free speech. In addition, they argue that the public dissemination of Osbourne's recorded music did not, as a matter of law, negligently or intentionally invade any right of plaintiffs or constitute a violation of Penal Code section 401.

## DISCUSSION

### 1. *The First Amendment Bars Plaintiffs' Action*

Our consideration of plaintiffs' novel attempt to seek postpublication damages for the general public dissemination of recorded music and lyrics must commence "with [the] recognition of the overriding constitutional principle that material communicated by the public media . . . [including artistic expressions such as the music and lyrics here involved], is generally to be accorded protection under the First Amendment to the Constitution of the United States. (*Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 501 [96 L.Ed. 1098, 72 S.Ct. 777] [ ]; *Winters* v. *New York Co.* (1948) 333 U.S. 507, 510 [92 L.Ed. 840, 68 S.Ct. 665] [ ].)" (*Olivia N.* v. *National Broadcasting Co.* (1977) 74 Cal.App.3d 383, 387 [141 Cal.Rptr. 511] [*Olivia I*].) "First Amendment rights are accorded a preferred place in our democratic society. (*Thomas* v. *Collins* (1945) 323 U.S. 516, 530 [89 L.Ed. 430, 440, 65 S.Ct. 315].) First Amendment protection extends to a communication, to its source and to its recipients. (*Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 756 [48 L.Ed.2d 346, 354, 96 S.Ct. 1817].) '[A]bove all else, the First Amendment means that government has

no power to restrict expression because of its message, its ideas, its subject matter, or its content.' (*Police Department of Chicago* v. *Mosley* (1972) 408 U.S. 92, 95 [33 L.Ed.2d 212, 216, 92 S.Ct. 2286]; see *Consolidated Edison* v. *Public Serv. Comm'n* (1980) 447 U.S. 530, 538-539 [65 L.Ed.2d 319, 328-329, 100 S.Ct. 2326]; *Carey* v. *Brown* (1980) 447 U.S. 455, 462-463 [65 L.Ed.2d 263, 270-271, 100 S.Ct. 2286]; *Cohen* v. *California* (1971) 403 U.S. 15, 24 [29 L.Ed.2d 284, 293, 91 S.Ct. 1780]; *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 269-270 [11 L.Ed.2d 686, 700-701, 84 S.Ct. 710, 95 A.L.R.2d 1412].) Applied to the electronic media, the First Amendment means that it is the broadcaster that has authority to make programming decisions. (*Writers Guild of America, West, Inc.* v. *F. C. C.* (C.D.Cal. 1976) 423 F.Supp. 1064, 1154.)" (*Olivia N.* v. *National Broadcasting Co.* (1981) 126 Cal.App.3d 488, 492-493 [178 Cal.Rptr. 888] [*Olivia II*].)

■ First Amendment guaranties of freedom of speech and expression extend to all artistic and literary expression, whether in music, concerts, plays, pictures or books. (*Schad* v. *Mount Ephraim* (1981) 452 U.S. 61, 65 [68 L.Ed.2d 671, 101 S.Ct. 2176] (nonobscene nude dancing).) As the court in *Schad* noted, "Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee." (*Ibid.*) "[M]usic is a form of expression that is protected by the first amendment." (*Cinevision Corp.* v. *City of Burbank* (9th Cir. 1984) 745 F.2d 560, 567, cert. denied, 471 U.S. 1054 [85 L.Ed.2d 480, 105 S.Ct. 2115].)

■ " '[T]he life of the imagination and intellect is of comparable import to the presentation of the political process; the First Amendment reaches beyond protection of citizen participation in, and ultimate control over, governmental affairs and protects in addition the interest in free interchange of ideas and impressions for their own sake, for whatever benefit the individual may gain.' " (*Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 512 [217 Cal.Rptr. 225, 703 P.2d 1119].) The rights protected are not only those of the artist to give free rein to his creative expression, but also those of the listener to receive that expression. (See *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 756 [48 L.Ed.2d 346, 354-355, 96 S.Ct. 1817].) "[T]he central concern of the First Amendment . . . is that there be a free flow from creator to audience of whatever message a film or book might convey. . . . [T]he central First Amendment concern remains the need to maintain free access of the public to the expression." (*Young* v. *American Mini Theatres* (1976) 427 U.S. 50, 77 [49 L.Ed.2d 310, 96 S.Ct. 2440], conc. opn. of Powell, J.)

■ However, the freedom of speech guaranteed by the First Amendment is not absolute. There are certain limited classes of speech which may

be prevented or punished by the state consistent with the principles of the First Amendment: (1) obscene speech is not protected by the First Amendment. (*Miller* v. *California* (1973) 413 U.S. 15, 23, 34-35 [37 L.Ed.2d 419, 430, 436-437, 93 S.Ct. 2607], rehg. den., 414 U.S. 881 [38 L.Ed.2d 128, 94 S.Ct. 26]); (2) "libel, slander, misrepresentation, obscenity, perjury, false advertising, solicitation of crime, complicity by encouragement, conspiracy, and the like" are also outside the scope of constitutional protection. (*Konigsberg* v. *State Bar* (1961) 366 U.S. 36, 49, fn. 10 [6 L.Ed.2d 105, 116, 81 S.Ct. 997]); (3) the constitutional freedom for speech and press does not immunize "speech or writing used as an integral part of conduct in violation of a valid criminal statute." (*Giboney* v. *Empire Storage Co.* (1949) 336 U.S. 490, 498 [93 L.Ed. 834, 841, 69 S.Ct. 684]); and finally, (4) speech which is directed to inciting or producing imminent lawless action, and which is likely to incite or produce such action, is outside the scope of First Amendment protection. (*Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 447-448 [23 L.Ed.2d 430, 433-434, 89 S.Ct. 1827].)

 Plaintiffs argue that it is the last of these exceptions, relating to culpable incitement, which removes Osbourne's music from the protection of the First Amendment. This issue is properly addressed on demurrer since the question of whether his music falls within the category of unprotected speech is one of law where, as is the case here, the facts are undisputed. (*L. A. Teachers Union* v. *L. A. City Bd. of Ed.* (1969) 71 Cal.2d 551, 556 [78 Cal.Rptr. 723, 455 P.2d 827]; *Johnson* v. *County of Santa Clara* (1973) 31 Cal.App.3d 26, 32 [106 Cal.Rptr. 862].)

 It is settled that ". . . the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." (*Brandenburg* v. *Ohio, supra,* 395 U.S. 444, 447 [23 L.Ed.2d 430, 434, 89 S.Ct. 1827]. Thus, to justify a claim that speech should be restrained or punished because it is (or was) an incitement to lawless action, the court must be satisfied that the speech (1) was directed or intended toward the goal of producing imminent lawless conduct *and* (2) was likely to produce such imminent conduct. Speech directed to action at some indefinite time in the future will not satisfy this test. *(Hess* v. *Indiana* (1973) 414 U.S. 105, 108 [38 L.Ed.2d 303, 94 S.Ct. 326].)

In the context of this case we must conclude, in order to find a culpable incitement, (1) that Osbourne's music was *directed and intended* toward the goal of bringing about the imminent suicide of listeners *and* (2) that it was *likely* to produce such a result. It is not enough that John's suicide may have been the result of an unreasonable reaction to the music; it must have

been a specifically intended consequence. (*Braxton* v. *Municipal Court* (1973) 10 Cal.3d 138, 148 [109 Cal.Rptr. 897, 514 P.2d 697].)

We can find no such intent or likelihood here. Apart from the "unintelligible" lyrics quoted above from "Suicide Solution," to which John admittedly was not even listening at the time of his death,[7] there is nothing in any of Osbourne's songs which could be characterized as a command to an immediate suicidal act. None of the lyrics relied upon by plaintiffs, even accepting their literal interpretation of the words, purport to order or command anyone to any concrete action at any specific time, much less immediately. Moreover, as defendants point out, the lyrics of the song on which plaintiffs focus their primary objection can as easily be viewed as a poetic device, such as a play on words, to convey meanings entirely contrary to those asserted by plaintiffs.[8] We note this here not to suggest a reliance upon a construction which is contrary to plaintiffs' allegations, but to illuminate the very serious problems which can arise when litigants seek to cast judges in the role of censor.

Merely because art may evoke a mood of depression as it figuratively depicts the darker side of human nature does not mean that it constitutes a direct "incitement to imminent violence." The lyrics sung by Osbourne may well express a philosophical view that suicide is an acceptable alternative to a life that has become unendurable—an idea which, however unorthodox, has a long intellectual tradition.[9] If that is the view expressed, as plaintiffs apparently contend, then defendants are constitutionally free to advocate it. Plaintiffs' argument that speech may be punished on the ground it has a tendency to lead to suicide or other violence is precisely the doctrine rejected by the Supreme Court in *Hess* v. *Indiana, supra,* 414 U.S. at pp. 107-109 [38 L.Ed.2d at pp. 306-307] (the words "We'll take the f-----g street again (or later)," shouted to a crowd at an antiwar demonstration, amounted to "nothing more than advocacy of illegal action at some indefinite future

---

[7] Indeed, plaintiffs have not alleged, nor do they argue here, that John ever actually heard and understood these lyrics. They allege only that the lyrics *could* be heard and understood with sufficient concentration.

[8] For example, the defendant CBS's analysis of "Suicide Solution" argues that ". . . the vocalist casts his remarks to a hypothetical alcohol abuser. The song expresses the abuser's anxiety, discordant thoughts, and self-destructive behavior: He is alienated and despondent ['cause you feel life's unreal and you're living a lie . . .']; he drinks to 'drown [his] sorrows' and now is given over alcohol ['now you live inside a bottle . . .] [*sic*]. But he refuses to see that he is killing himself by drinking ['The reaper's traveling at full throttle, It's catching you but you don't see, The reaper is you and the reaper is me . . .']. The abuser will not help himself and only feels hopeless ['But you lie there and moan, where to hide, suicide is the only way out . . .'] [*sic*]. Finally, the song asks: 'Don't you know what it's *really* about?' [¶] The theme is symbolized by the title, a play on words: The alcohol abuser uses alcohol (a liquid solution) as a 'solution' to his anxiety, but because it will kill him in the end, it is a 'suicide solution.' "

[9] See footnote 4.

time"; words could not be punished as "incitement" on the ground that they had a " ' "tendency to lead to violence" ' ").

Moreover, musical lyrics and poetry cannot be construed to contain the requisite "call to action" for the elementary reason that they simply are not intended to be and should not be read literally on their face, nor judged by a standard of prose oratory. Reasonable persons understand musical lyrics and poetic conventions as the figurative expressions which they are. No rational person would or could believe otherwise nor would they mistake musical lyrics and poetry for literal commands or directives to immediate action.[10] To do so would indulge a fiction which neither common sense nor the First Amendment will permit.

While we have found no California case dealing directly with recorded music and lyrics, the claim that certain fictional depictions in the film or electronic media have incited unlawful conduct, and should result in the imposition of tort liability, is by no means novel. However, all such claims have been rejected on First Amendment grounds. (See *Olivia I* and *Olivia II* (plaintiff was attacked and "artificially raped" with a bottle by persons who had recently seen and discussed similar scenes in the television film, "Born Innocent"); *Bill* v. *Superior Court, supra,* 137 Cal.App.3d 1002 (plaintiff shot outside a theater showing a violent movie made by defendants which allegedly attracted violence-prone individuals who were likely to injure members of the general public at or near the theater); *DeFilippo* v. *National Broadcasting Co. Inc.* (R.I. 1982) 446 A.2d 1036 (plaintiffs' son died attempting to imitate a "hanging stunt" which he saw on television); *Walt Disney Productions Inc.* v. *Shannon* (1981) 247 Ga. 402 [276 S.E.2d. 580, 20 A.L.R.4th 321] (plaintiff partially blinded when he attempted to reproduce some sound effects demonstrated on television by rotating a lead pellet around in an inflated balloon); *Zamora* v. *Columbia Broadcasting System* (S.D.Fla. 1979) 480 F.Supp. 199 (minor plaintiff had become so addicted to and desensitized by television violence that he developed a sociopathic personality and as a result shot and killed an 83-year-old neighbor).

 Plaintiffs, recognizing the dearth of case authority which would support their incitement theory, make essentially a procedural argument. They contend that the court cannot determine the question of whether Osbourne's music and lyrics constituted an incitement but rather the issue should be left to a jury. They rely on *Olivia I*, 74 Cal.App.3d 383, 389-390,

---

[10]This is particularly true when the artist's performance of such musical lyrics and poetry was physically and temporally remote from the listener who only subsequently hears such performance by means of an electronic recording. The circumstances and conditions under which the listener might receive such performance are infinitely variable and totally beyond both the control and the anticipation of the performing artists and the producers and distributors of the recording.

where the court, in the first of two appellate decisions dealing with the film "Born Innocent," held that the trial judge, on the day assigned for jury trial and *without any summary judgment motion pending,* should not have viewed the film himself and made fact findings that the film did not advocate or encourage violent or depraved acts. The plaintiff had requested a trial by jury and was entitled to one.

However, plaintiffs' reliance on this case is misplaced. We view it as strictly a procedural decision dealing with the technical rights of a party after a proper request for a jury trial has been made. The First Amendment issue was never reached and the appellate opinion itself acknowledged that the court could have accomplished the same result *if* a properly noticed summary judgment motion had been before it. To the extent that any broader interpretation is given to *Olivia I,* we respectfully decline to follow it in this case.

■ In our view, the plaintiffs have fully pleaded the facts which will be presented on the issue of incitement and we conclude that, as a matter of law, they fail to meet the *Brandenburg* standard for incitement and that therefore Osbourne's music is speech protected by the First Amendment.

■ The scope of such protection is not limited to merely serving as a bar to the prior restraint of such speech, but also prevents the assertion of a claim for civil damages. "[T]he fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute." (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 277 [11 L.Ed.2d 686, 705, 84 S.Ct. 710].) Musical composers and performers, as well as record producers and distributors, would become significantly more inhibited in the selection of controversial materials if liability for civil damages were a risk to be endured for publication of protected speech. The deterrent effect of subjecting the music and recording industry to such liability because of their programming choices would lead to a self-censorship which would dampen the vigor and limit the variety of artistic expression. Thus, the imposition here of postpublication civil damages, in the absence of an incitement to imminent lawless action, would be just as violative of the First Amendment as a prior restraint.

2. *The First Amendment Bar Aside, Plaintiffs Have Alleged No Basis for Recovery of Damages*

 a. *Defendants Cannot Be Liable in Negligence as They Owed No Duty to Plaintiffs*

■ The threshold and, in this case, dispositive question with respect to the assertion of a claim for negligence is whether any duty was

owed to the plaintiffs. This is primarily a question of law (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]) which is determined by an examination of several factors. Those factors include "the foreseeability of harm to the plaintiff, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 806 [205 Cal.Rptr. 842, 685 P.2d 1193].)

Foreseeability is one of several factors to be weighed in determining whether a duty is owed in a particular case. (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 125 [211 Cal.Rptr. 356, 695 P.2d 653].) " 'In this balancing process, foreseeability is an elastic factor. [Citation.] The degree of foreseeability necessary to warrant the finding of a duty will thus vary from case to case. For example, in cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required. [Citation.]' " (*Id.,* at p. 125.) Here, a very high degree of foreseeability would be required because of the great burden on society of preventing the kind of "harm" of which plaintiffs complain by restraining or punishing artistic expression. The "countervailing policies" which arise out of the First Amendment "have substantial bearing upon the issue whether there should be imposed upon [defendants] the exposure to liability of the kind for which plaintiffs contend." (*Bill* v. *Superior Court, supra,* 137 Cal.App.3d 1002, 1013.)

Plaintiffs rely on *Weirum* for the proposition that harm to John from listening to Osbourne's music was foreseeable. In that case, a radio station was held liable for the wrongful death of a motorist killed by two speeding teenagers participating in the station's promotional giveaway contest. In live periodic announcements the station advised its mobile listeners that one of its disc jockeys, "the Real Don Steele," was traveling from location to location in a conspicuous red automobile and advised the audience of his intended destinations. The first listener to meet Steele at each location would get a prize. While following Steele's car, the two teenagers forced a motorist into the center divider where his car overturned resulting in his death. (*Weirum* v. *RKO General Inc., supra,* 15 Cal.3d at pp. 44-45.)

In our view, plaintiffs' reliance on *Weirum* is not justified. As the court there noted, the issue was "civil accountability for the foreseeable results of a broadcast which created an undue risk of harm to decedent. The First Amendment does not sanction the infliction of physical injury merely because achieved by word, rather than act." (*Id.,* at p. 48.) Indeed, it would not be inappropriate to view the reckless importuning in *Weirum* as a specie of incitement to imminent lawless conduct for which no First Amendment protection is justified. What the conduct in *Weirum* and culpable incitement have in common, when viewed from the perspective of a duty analysis, is a very high degree of foreseeability of undue risk of harm to others. Under such circumstances, imposition of negligence liability does not offend the First Amendment.

The court, in *Olivia II*, placed *Weirum* in its proper perspective when it stated, in language equally applicable here, "[a]lthough the language utilized by the Supreme Court was broad, it must be understood in light of the particular facts of that case. The radio station's broadcast was designed to encourage its youthful listeners to be the first to arrive at a particular location in order to win a prize and gain momentary glory. The *Weirum* broadcasts actively and repeatedly encouraged listeners to speed to announced locations. Liability was imposed on the broadcaster for urging listeners to act in an inherently dangerous manner." (*Id.,* at p. 496.) That they were very likely to do so was clearly foreseeable. Not so here. Osbourne's music and lyrics had been recorded and produced years before. There was not a "real time" urging of listeners to act in a particular manner. There was no dynamic interaction with, or live importuning of, particular listeners.

While it is true that foreseeability is ordinarily a question of fact (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56 [192 Cal.Rptr. 857, 665 P.2d 947]), it may be decided as a question of law if " 'under the disputed facts there is no room for a reasonable difference of opinion.' " (*Id.,* at p. 56.) This is such a case. John's tragic self-destruction, while listening to Osbourne's music, was not a reasonably foreseeable risk or consequence of defendants' remote artistic activities.

Plaintiffs' case is not aided by an examination of the other factors which are a part of the duty analysis. It cannot be said that there was a close connection between John's death and defendants' composition, performance, production and distribution years earlier of recorded artistic musical expressions. Likewise, no moral blame for that tragedy may be laid at defendants' door. John's suicide, an admittedly irrational response to Osbourne's music, was not something which any of the defendants intended, planned or had any reason to anticipate. Finally, and perhaps most significantly, it is simply not acceptable to a free and democratic society to

impose a duty upon performing artists to limit and restrict their creativity in order to avoid the dissemination of ideas in artistic speech which may adversely affect emotionally troubled individuals. Such a burden would quickly have the effect of reducing and limiting artistic expression to only the broadest standard of taste and acceptance and the lowest level of offense, provocation and controversy.[11] No case has ever gone so far. We find no basis in law or public policy for doing so here.

### b. *There Are No Allegations That Defendants Intended to Cause John's Suicide*

 The third and fourth alleged causes of action are essentially identical. They each rely upon the proposition that defendants incur intentional tort liability for John's suicide because of their intentional dissemination of Osbourne's recorded music with the alleged knowledge that it would result in self-destructive reactions among certain individuals. The third count characterizes this as an intentional incitement to suicide. We have already discussed in some detail why Osbourne's music and lyrics cannot be condemned as an incitement to imminent lawless action. It is also clear that plaintiffs have not adequately alleged a culpable intent. For example, there are no allegations that defendants actually intended any harm to John or any other listener.

It is not sufficient simply to allege that defendants intentionally did a particular act. It must also be shown that such act was done with the intent to cause injury. (*Tate* v. *Canonica* (1960) 180 Cal.App.2d 898, 909 [5 Cal.Rptr. 28].) In other words, plaintiffs would have to allege that defendants intended to cause John's (or some other listener's) suicide and made the subject recorded music available for that purpose. It is clear that no such allegation can be made in this case. What plaintiffs have alleged does not demonstrate the requisite intent.[12]

---

[11] As another court observed in a different but clearly relevant context, "It is an unfortunate fact that in our society there are people who will react violently to movies, or other forms of expression, which offend them, whether the subject be gangs, race relations, or the Vietnam War. It may, in fact, be difficult to predict what particular expression will cause such a reaction, and under what circumstances. To impose upon the producers of a motion picture the sort of liability for which plaintiffs contend in this case would, to a significant degree, permit such persons to dictate, in effect, what is shown in the theaters of our land." (*Bill* v. *Superior Court, supra,* 137 Cal.App.3d 1002, 1008-1009.)

[12] Plaintiffs' allegations in the proposed second amended complaint that defendants "intentionally disseminated to the public music . . . which [1] overtly and intentionally intended to . . . cause *an individual* to commit . . . suicide [count III] [or] [2] overtly and intentionally aided and/or advised and/or encouraged *another person* to commit . . . suicide . . . [count IV]" (italics supplied), are merely general conclusionary allegations and do not adequately allege any intentional conduct on the part of the defendants beyond their intentional composition, performance, production and distribution of certain recorded music. There are no alle-

■ The same analysis applies to plaintiffs' allegations (in count IV) regarding the violation of Penal Code section 401.[13] Our Supreme Court has construed that section as proscribing the *direct* aiding and abetting of a specific suicidal act. The statute "contemplates some participation in the events leading up to the commission of the final overt act, such as furnishing the means for bringing about the death—the gun, the knife, the poison, or providing the water, for the person who himself commits the act of self-murder." (*In re Joseph G.* (1983) 34 Cal.3d 429, 436 [194 Cal.Rptr. 163, 667 P.2d 1176, 40 A.L.R.4th 690].) While this decision was rendered in the context of distinguishing those circumstances when a criminal defendant should be charged with murder instead of the lesser crime of aiding and abetting a suicide, we see no reason to give less weight here to the court's analysis. Some active and intentional participation in the events leading to the suicide are required in order to establish a violation.

To satisfy the burden of section 401, defendants would have to (1) have specifically intended John's suicide and (2) have had a direct participation in bringing it about. Plaintiffs' allegations that defendants intentionally produced and distributed Osbourne's music do not demonstrate that they intentionally aided or encouraged John's suicide. It is not sufficient to allege, as plaintiffs do here, that defendants "intentionally disseminated" Osbourne's music to the general public although they knew, or should have known, that there were emotionally fragile people who could have an adverse reaction to it.

In the absence of evidence of the requisite intent and participation, Penal Code section 401 cannot be applied to composers, performers, producers and distributors of recorded works of artistic expression disseminated to the general public which allegedly have an adverse emotional impact on some listeners or viewers who thereafter take their own lives.

CONCLUSION

Absent an incitement, which meets the standards of *Brandenburg* v. *Ohio, supra,* 395 U.S. 444, 447 [23 L.Ed.2d 430, 433-434], the courts have been universally reluctant to impose tort liability upon any public media for self-destructive or tortious acts alleged to have resulted from a publication or broadcast (see, e.g., *Olivia II, supra,* 126 Cal.App.3d 488; *Bill* v. *Superior*

---

gations of any kind reflecting that defendants had any knowledge of, or intent with respect to, John himself or any other particular listener.

 [13] Penal Code section 401 reads: "Every person who deliberately aids, or advises, or encourages another person to commit suicide, is guilty of a felony."

 In view of our conclusion that section 401 has no application to John's suicide, we do not reach or discuss the question of whether its violation by defendants would give plaintiffs a private right of action or even entitle them to a jury instruction on negligence per se (BAJI No. 3.45).

*Court, supra,* 137 Cal.App.3d 1002; *DeFilippo* v. *National Broadcasting Co. Inc., supra,* 446 A.2d 1036; *Walt Disney Productions Inc.* v. *Shannon, supra,* 276 S.E.2d 580; *Zamora* v. *Columbia Broadcasting System Inc., supra,* 480 F.Supp. 199.) We share that reluctance and, for all of the reasons discussed above, conclude that the defendants, as a matter of law, have no liability for John's suicide.

The trial court was thus correct in bringing this action to a prompt end. "[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.]" (*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572].)

## DISPOSITION

The trial court's order of dismissal is affirmed. The defendants shall recover their costs on appeal.

Danielson, Acting P. J., and Arabian, J., concurred.

A petition for a rehearing was denied July 27, 1988, and appellants' petition for review by the Supreme Court was denied October 12, 1988.