Vivian RICE, et al., Plaintiffs,

v.

PALADIN ENTERPRISES, INC. et al., Defendants.

Michael D. SAUNDERS, et al., Plaintiffs,

v.

PALADIN ENTERPRISES, INC., et al., Defendants.

Civil Action Nos. AW 95–3811, AW 96–444.

United States District Court, D. Maryland, Southern Division.

Sept. 6, 1996.

Howard L. Siegel, and John Marshall, Rockville, MD, and Rodney A. Smolla, Williamsburg, VA, for plaintiffs Rice, Farmer and Horn.

Thomas L. Heeney, Washington, DC, for plaintiff Saunders.

Lee J. Levine, Seth D. Berlin, Washington, DC, Natalie Hanlon–Leh, Thomas B. Kelley and Steven A. Zansberg, Denver, CO, for defendants Paladin Enterprises, Inc. and Peter C. Lund.

Bruce W. Sanford, College Park, MD, and Henry S. Hoberman, and James E. Houpt, Washington, DC, for amici American Booksellers Foundation for Free Expression, Association of American Publishers, E. W. Scripps Company, Freedom Forum First Amendment Center, Freedom to Read Foundation, Media/Professional Insurance, Magazine Publishers of America, Inc., National Association of Broadcasters, Newspaper Association of America, Reporters Committee for Freedom of the Press, Society of Professional Journalists, and Thomas Jefferson Center for the Protection of Free Expression; Douglas D. Connah, Jr., Baltimore, Maryland, for amicus Courtroom Television Network.

## AMENDED MEMORANDUM OPINION

WILLIAMS, District Judge.

Plaintiffs filed wrongful death and survival actions against the Defendants Paladin Enterprises, Inc. ("Paladin"), a book publishing company, and its President, Peter Lund, for the triple murder committed by convicted killer, James Perry, who had purchased two of the Defendants' books prior to committing the murders.[1] Federal jurisdiction is properly invoked pursuant to 28 U.S.C. § 1332(a)(1) because the parties are from different states and the amount in controversy exceeds $50,000. According to the Plaintiffs, the Defendants aided and abetted the murders of the three decedents by publishing two books which James Perry consulted to commit the murders: *Hit Man: A Technical Manual for Independent Contractors ("Hit Man")* and *How to Make a Disposable Silencer, Vol. II ("Silencers")*. The Plaintiffs are also seeking damages in their survival and wrongful death actions based on theories of civil conspiracy, strict liability, and negligence.

Pending before the Court is the Defendants' motion for summary judgment. The Defendants argue, at the outset, that they cannot be held liable for civil damages because they have a First Amendment right to publish these books. The Court has considered the parties respective memoranda and the entire record. The Court has also permitted oral argument by counsel at a hearing conducted on July 22, 1996. For the reasons that follow, the Court will grant the Defendants' motion for summary judgment.

### I. Background

For the purposes of this motion, the parties have stipulated to the following set of facts. *Hit Man* and *Silencers* were both published in 1983 and, since then, approximately 13,000 copies of each book have been sold nationally. Paladin advertises the book in its mail order catalogue which has the following description:

HIT MAN

A Technical Manual for Independent Contractors *by Rex Feral*

Rex Feral kills for hire. Some consider him a criminal. Others think him a hero. In truth, he is a lethal weapon aimed at those he hunts. He is a last recourse in these times when laws are so twisted that justice goes unserved. He is a man who feels no twinge of guilt at doing his job. *He is a professional killer.*

Learn how a pro gets assignments, creates a false identity, makes a disposable silencer, leaves the scene without a trace, watches his mark unobserved and more. Feral reveals how to get in, do the job and get out without getting caught. *For academic study only.* 5½ × 8½, softcover, 19 photos, illus., 144 pp.

ISBN 0–87364–276–7          $10.00

Def.'s Ex. 1 at 41.

On the page preceding the table of contents, the following disclaimer appears:

WARNING

IT IS AGAINST THE LAW TO manufacture a silencer without an appropriate license from the federal government. There are state and local laws prohibiting the possession of weapons and their accessories in many areas. Severe penalties are

---

1. James Perry was convicted in Montgomery County Circuit Court and sentenced to death for killing Mildred Horn, her 8 year old quadriplegic son, Trevor, and the boy's nurse, Janice Saunders. Lawrence Horn was also convicted in Montgomery County Circuit Court and sentenced to life without the possibility of parole for hiring Perry to commit the murders.

prescribed for violations of these laws. Neither the author nor the publisher assumes responsibility for the use or misuse of information contained in this book. For informational purposes only!

Def.'s Ex. B at v.

It is undisputed that prior to March 3, 1992, Lawrence Horn began plotting with James Perry of Detroit, Michigan to have Perry murder his ex-wife, Mildred Horn, and his son, Trevor. On or about January 24, 1992, James Perry responded to a catalogue solicitation by the defendant, Paladin, advertising *Hit Man* and *Silencers*. Perry ordered and received both publications. Paladin had no other contact with Perry nor with Lawrence Horn.

On March 3, 1993, James Perry traveled from Detroit, Michigan to Montgomery County, Maryland and murdered Mildred Horn, Trevor Horn, and Janice Saunders, Trevor's private duty nurse. Perry followed a number of instructions outlined in *Hit Man* and *Silencers* in planning, executing and attempting to get away with the murders. However, Defendants had no specific knowledge that either Perry or Horn planned to commit a crime; that Perry and Horn had entered into a conspiracy for the purpose of committing a crime; nor that Perry had been retained by Horn to murder Mildred Horn, Trevor Horn, or Janice Saunders.

Defendants concede, for the purposes of this motion, that in publishing, distributing and selling *Hit Man* and *Silencers* to Perry, they assisted him in the subsequent perpetration of the murders which are the subject of this litigation. For example, each of the excerpts from *Hit Man* listed below was followed by Perry in the planning and execution of the murders for which he was convicted:

"What other basic equipment will the beginner need as essential tools of his trade? ... [an] AR–7 rifle." (p. 21)

James Perry used an AR–7 rifle to commit the murders of Mildred Horn and Janice Saunders.

"The AR–7 rifle is recommended because it is both inexpensive and accurate. The barrel breaks down for storage inside the stock with the clip. It is lightweight and easy to carry or conceal when disassembled." (p. 22)

After the murders, James Perry disassembled the AR–7 rifle as instructed by the Defendants.

"The AR–7 has a serial number stamped on the case, just above the clip port. This number should be completely drilled out. The hole left will be unsightly but will not interfere with the working mechanism of the gun or the clip feed." (p. 23)

James Perry drilled out the serial number of the AR–7 rifle exactly as instructed by the Defendants.

"The directions and photographs that follow show in explicit detail how to construct a silencer for a Ruger 10/22 rifle. The same directions can be followed successfully to construct a silencer for any weapon, with only the size of the drill rod used for alignment changed to fit the inside dimension of the barrel." (p. 39)

James Perry used a homemade silencer which he used to silently kill Mildred Horn and Janice Saunders.

"Close kills are by far preferred to shots fired over a long distance. You will need to know beyond any doubt that the desired result has been achieved. When using a small caliber weapon like the 22, it is best to shoot from a distance of three to six feet. You will not want to be at point blank range to avoid having the victim's blood splatter you or your clothing. At least three shots should be fired to insure quick and sure death ... aim for the head—preferably the eye sockets if you are a sharpshooter." (p. 24)

James Perry shot Mildred Horn and Janice Saunders from a distance of three feet. He shot them each three times in the eyes.

"Use a rat-tail file, alter the gun barrel, the shell chamber, the loading ramp, the firing pin and the ejector pin. Each one of these items leaves its own definite mark and impression on the shell casing, which if any shells happened to be left behind, can be matched up to the gun under a microscope in a police laboratory. (p. 25) ... Of primary importance now too, is chang-

ing the rifling of the murder weapon. This should be done even before you leave the crime scene. That way, even if you get picked up or stopped with the weapon in your possession, its ballistics will not match the bullets you left behind in the mark." (p. 105)

James Perry filed down the parts of the AR–7 Rifle.

Perry followed additional instructional references from *Hit Man* in planning and executing the murders, including how to solicit for and obtain prospective clients in need of murder for hire services; requesting upfront money for expenses; how to register at a motel in the vicinity of the crime, paying with cash and using a fake license tag number; committing the murders at the victims' home; how to make the crime scene look like a burglary; reminding to clean up and carry away the ejected shells; breaking down the gun and discarding the pieces along the roadside after the murders; and using a rental car, a stolen tag on the rental car and the discarding of the tag after the murders.

Paladin engaged in a marketing strategy intended to attract and assist criminals and would-be criminals who desire information and instructions on how to commit crimes. In publishing, marketing, advertising and distributing *Hit Man* and *Silencers*, Paladin intended and had knowledge that their publications would be used, upon receipt, by criminals and would-be criminals to plan and execute the crime of murder for hire, in the manner set forth in the publications.

All parties agree that Paladin's marketing strategy is intended to maximize sales to the public, including authors who desire information for the purpose of writing books about crime and criminals, law enforcement officers and agencies who desire information concerning the means and methods of committing crimes, persons who enjoy reading accounts of crimes and the means of committing them for purposes of entertainment, persons who fantasize about committing crimes but do not thereafter commit them, and criminologists and others who study criminal methods and mentality.

## II. Legal Standard

### A. Summary Judgment Principles

Summary judgment will be granted when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). While the Court views the underlying facts and all reasonable inferences drawn therefrom in the light most favorable to the opposing party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), the mere existence of a "scintilla of evidence" is not enough to frustrate the motion. To defeat a motion for summary judgment, a party must present evidence of specific facts from which the finder of fact could reasonably find for him. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### B. First Amendment Freedom of Speech

The First Amendment to the United States Constitution states that Congress shall make no law abridging the freedom of speech, or of the press. The First Amendment applies to the states through the Fourteenth Amendment. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 560 n. 2, 100 S.Ct. 2814, 28⁻ n. 2, 65 L.Ed.2d 973 (1980) (Stewart, J., concurring). The imposition of tort liability constitutes state action, so the First Amendment is applicable in this case. *New York Times v. Sullivan,* 376 U.S. 254, 265, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964) ("The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised").

Simply stated, if the Court finds that *Hit Man* is protected by the First Amendment, the Plaintiffs are barred from maintaining tort claims against Paladin. Admittedly, the Court's task is both novel and awesome; the Court must balance society's interest in compensating injured parties against the freedom of speech guaranteed by the First Amendment. The First Amendment bars the imposition of civil liability on Paladin

unless *Hit Man* falls within one of the well-defined and narrowly limited classes of speech that are unprotected by the First Amendment. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942).

■ Those classes of speech which receive limited or no First Amendment protection include: (1) obscenity, *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973); (2) fighting words, *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769; (3) libel, *New York Times Co. v. Sullivan,* 376 U.S. 254, 267, 84 S.Ct. 710, 719, 11 L.Ed.2d 686 (1964); (4) commercial speech, *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978) and; (5) words likely to incite imminent lawless action, *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

*Hit Man* cannot be characterized as obscenity because it does not "depic[t] or describ[e], in a patently offensive way, sexual conduct ..." *Miller,* 413 U.S. at 24, 93 S.Ct. at 2615. Nor can it be categorized as fighting words since the words in the book do not, "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769. *Hit Man* clearly is not libelous since it does not tend to injure the reputation of any particular individual. *New York Times,* 376 U.S. at 267, 84 S.Ct. at 719.

■ *Hit Man* does not fall into the category of commercial speech. It is well settled that commercial speech is speech which does "no more than propose a commercial transaction." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, et al.,* 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973). Commercial speech also provides information for purposes of inviting or enticing one to buy goods or services. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (noting the informational function of commercial speech). Although *Hit Man* is published for profit, the book itself cannot be considered an effort to achieve the type of commercial result that an advertisement is designed to achieve.

Therefore, the book cannot be characterized as commercial speech.

The Court believes that the only category of unprotected speech under which *Hit Man* could conceivably be placed is incitement to imminent, lawless activity under *Brandenburg.* Therefore, as will be discussed shortly, the Court will conduct its analysis of whether the book is protected by the First Amendment under the *Brandenburg* standard.

### III.  *Discussion*

Plaintiffs have essentially advanced five arguments to support its assertion that summary judgment should not be granted in this case. First, Plaintiffs argue that the First Amendment does not protect speech aiding and abetting murder. Paper No. 22 at 2. Plaintiffs' second argument is that the "knowing or reckless disregard for human life" standard of *New York Times* is the appropriate standard to be applied to this case. Paper No. 22 at 26. Third, Plaintiffs contend that the *Brandenburg* standard does not apply. Paper No. 22 at 23. Fourth, they argue that even if the Court finds that *Brandenburg* applies, that standard does not bar liability in this action. Paper No. 22 at 7. Finally, Plaintiffs urge the Court to be guided by the decisions in the *Soldier of Fortune* cases. The Court will address each of these arguments in turn.

### `  A.  *Aiding and Abetting*

■ A brief history of aiding and abetting will serve to guide the Court in its analysis. Aiding and abetting is an ancient criminal law doctrine. *Central Bank v. First Interstate Bank,* 511 U.S. 164, ——, 114 S.Ct. 1439, 1450, 128 L.Ed.2d 119 (1994) (citing *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938); 1 M. Hale, Pleas of the Crown 615 (1736)). Though there is no federal common law of crimes, Congress in 1909 enacted what is now 18 U.S.C. § 2, a general aiding and abetting statute applicable to all federal criminal offenses. *Central Bank,* 511 U.S. at ——, 114 S.Ct. at 1450. The statute decrees that those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves

committing a crime. *Id.* (citing *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949)).

The Restatement of Torts, under a concert of action principle, accepts a doctrine similar to criminal aiding and abetting. *Central Bank,* 511 U.S. at ——, 114 S.Ct. at 1450. An actor is liable for harm resulting to a third person from the tortious conduct of another "if he ... knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other ..." *Central Bank,* 511 U.S. at ——, 114 S.Ct. at 1450 (citing Restatement (Second) of Torts § 876(b) (1977)). However, the doctrine has been at best uncertain and limited in application. The concept of tortious aiding and abetting has turned up frequently in the evaluation of secondary liability for securities law violations, principally in the area of fraud. *Halberstam v. Welch,* 705 F.2d 472, 485 (D.C.Cir. 1983) (citations omitted).

In some states, it is still unclear whether there is aiding and abetting tort liability of the kind set forth in § 876(b) of the Restatement. *Central Bank,* 511 U.S. at ——, 114 S.Ct. at 1450 (citing *FDIC v. S. Prawer & Co.,* 829 F.Supp. 453, 457 (D.Maine 1993) (in Maine, "[i]t is clear ... that aiding and abetting liability did not exist under the common law, but was entirely a creature of statute"); *In re Asbestos School Litigation,* 1991 WL 137128 (E.D.Pa.1991) (cause of action under Restatement § 876 "has not yet been applied as a basis for liability" by Pennsylvania courts); *Meadow Limited Partnership v. Heritage Savings and Loan Assn.,* 639

F.Supp. 643, 653 (E.D.Va.1986) (aiding and abetting tort based on Restatement § 876 not expressly recognized by the state courts of the Commonwealth of Virginia); *Sloan v. Fauque,* 239 Mont. 383, 784 P.2d 895, 896 (1989) (aiding and abetting tort liability is issue "of first impression in Montana")).

■ Plaintiffs argue that *Hit Man* is not protected by the First Amendment because the First Amendment does not protect communication aiding and abetting murder. Paper No. 22 at 2. This argument, the Court believes, fails, however, because of the absence of any reported decision suggesting that Maryland extends the tort of aiding and abetting to the circumstances of this case.[2] A federal court sitting in diversity cannot create new causes of action. *Guy v. Travenol Laboratories, Inc.,* 812 F.2d 911 (4th Cir. 1987); *Tarr v. Manchester Ins. Corp.,* 544 F.2d 14, 15 (1st Cir.1976); *Woods v. Interstate Realty Co.,* 337 U.S. 535, 538, 69 S.Ct. 1235, 1237, 93 L.Ed. 1524 (1949). Therefore, the Court cannot apply a new theory or extend the tort of aiding and abetting under Maryland law, nor can the Court create another category of unprotected speech, i.e. speech that aids and abets murder.

Plaintiffs rely on *United States v. Barnett,* 667 F.2d 835 (9th Cir.1982) and *United States v. Buttorff,* 572 F.2d 619 (8th Cir.1978) *cert. denied,* 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 1136 (1978) for the proposition that criminal or tort liability may not be avoided merely because the wrongdoer uses speech to accomplish his illicit purpose. Paper No. 22 at 5. In *Barnett,* the defendant was the publisher of an instruction manual on how to

---

**2.** Although Maryland appears to recognize aider and abettor tort liability, (*See Alleco, Inc., et al. v. Weinberg Foundation, Inc., et al.,* 340 Md. 176, 199, 665 A.2d 1038, 1049 (1995)), it has never been applied to support liability in this context. At least one court has imposed civil liability for murder on an aiding and abetting theory. *Halberstam v. Welch,* 705 F.2d 472 (D.C.Cir.1983). In *Halberstam,* the defendant was the live-in companion of a burglar who committed murder during the course of a burglary. *Id.* at 475. The court held that the defendant was liable for the murder because she knowingly and substantially assisted the burglar in his illicit trade. *Id.* at 487.

Aiding and abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation. *Halberstam,* 705 F.2d at 477 (citing *Investors Research Corp. v. SEC,* 628 F.2d 168, 178 (D.C.Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 94–95 (5th Cir. 1975); *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139, 162–63 (3d Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974)).

manufacture the illegal drug known as PCP. Another person obtained the defendant's instruction manual and was caught in the act of manufacturing the illegal drugs. *Barnett*, 667 F.2d at 838. The defendant was prosecuted for aiding and abetting the manufacture of PCP. The defendant argued that evidence seized at the crime scene should be suppressed because the defendant had a First Amendment right to print the manual. The Court stated that:

> To the extent, however, that Barnett appears to contend that he is immune from search or prosecution because he uses the printed word in encouraging and counseling others in the commission of a crime, we hold expressly that the first amendment does not provide a defense as a matter of law to such conduct.

*Barnett*, 667 F.2d at 843.

Plaintiffs took great pains to outline the parallels between *Barnett* and the instant case: 1) defendants in both cases published and advertised step-by-step instructions on how to commit crimes; 2) defendants in both cases mailed an instruction manual to an unknown person who responded to the advertisement; and 3) perpetrators in both cases followed the step-by-step instructions to commit the crimes. Paper No. 22 at 3. One very important distinction, however, is that *Barnett* is a criminal case where the defendant publisher was charged with criminal aiding and abetting pursuant to 18 U.S.C. § 2. Here, Defendants are not being charged with the crime of aiding and abetting. Rather, Plaintiffs are asking the Court to allow the Defendants to be subjected to civil liability for murder, based on a theory of civil aiding and abetting—a claim that does not exist under Maryland law.

Similarly, in *Buttorff*, the defendants were convicted of aiding and abetting persons who filed false or fraudulent tax returns. *Buttorff*, 572 F.2d at 621. The defendants offered detailed instructions at large public meetings on how to illegally avoid paying taxes. *Id.* at 622. As a result, several individuals engaged in the illegal practices. *Id.* The court rejected the defendants' First Amendment defense and held that:

> Although the speeches here do not incite the type of imminent lawless activity referred to in criminal syndicalism cases, the defendants did go beyond mere advocacy of tax reform ... This speech is not entitled to first amendment protection and, as discussed above, was sufficient action to constitute aiding and abetting the filing of false or fraudulent withholding forms.

*Buttorff*, 572 F.2d at 624.

While these cases are factually similar, as stated above, Plaintiffs have cited no authority that would allow the Court to apply the holdings in these criminal cases to the facts of the instant case. Furthermore, the court in *Buttorff* applied the *Brandenburg* incitement standard and found that the defendants' speech went beyond mere advocacy to incitement of lawless activity. Therefore, the court held, defendants were not entitled to a First Amendment defense. *Id.* The failure of the First Amendment defense in the *Buttorff* case turned on the court's finding that the subject speech went beyond mere advocacy. Even if *Buttorff* applied in this case, it is not dispositive of a finding that the First Amendment acts as a bar to liability in the instant case.

B. *The New York Times v. Sullivan Standard*

■ The Plaintiffs posit that the *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) standard applies to this case. Paper No. 22 at 25. In *New York Times*, the court held that, in order to recover damages in a libel action, a public official must show actual malice or that a statement was made with knowledge of its falsity or with reckless disregard of whether it was true or false. *Id.* at 279, 84 S.Ct. at 725–26. Plaintiffs argue that if the First Amendment permits defendants guilty of knowing or reckless misconduct to be held liable in tort for millions of dollars in damages when their publications cause injury to reputation and its attendant emotional harm as in the *New York Times* case, then of course the First Amendment must permit parallel liability in tort when publications cause physical injury and death.

According to Plaintiffs, the appropriate standard to be applied in the case at bar is "knowing or reckless disregard for human life." Paper No. 22 at 26. However, the Plaintiffs cite no authority for this novel proposition. Furthermore, the Court finds that *New York Times v. Sullivan* is inapposite because, unlike the instant case, that case involved speech that tends to injure the reputation of a particular individual. The holding in that case has no bearing on the facts of this case.

Plaintiffs rely heavily on *Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 123 Cal.Rptr. 468, 539 P.2d 36 (1975) for the proposition that defendants can be held liable for physical injury caused by their words. In *Weirum*, the court affirmed an award of damages to the plaintiff in a wrongful death action against a radio station. The decedent was negligently forced off a highway by a listener to defendant's radio station which was conducting a contest rewarding the first contestant to locate a disc jockey travelling throughout the listening area. The court rejected the station's First Amendment defense, stating that

> "[d]efendant's contention that the giveaway contest must be afforded the deference due society's interest in the First Amendment is clearly without merit . . . The First Amendment does not sanction the infliction of physical injury merely because achieved by word, rather than act."

*Id.* at 48, 123 Cal.Rptr. 468, 539 P.2d 36. *Weirum* can be distinguished from the instant case because the Weirum broadcasts actively and repeatedly encouraged listeners to speed to announced locations. Liability was imposed on the broadcaster for urging listeners to act in an inherently dangerous manner. No such urging occurred in this case.

■ The Plaintiffs go on to cite several cases where the Supreme Court has approved civil liability sounding in tort, contract, and statutory causes of action despite the defendants' attempt to assert a First Amendment defense.[3] The Court agrees with Plaintiffs that a defendant does not enjoy absolute immunity from criminal or tort liability merely because he uses speech. The critical issue, however, is whether that speech is protected by the First Amendment. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915, 102 S.Ct. 3409, 3426–27, 73 L.Ed.2d 1215 (1982).

## C. The Brandenburg Standard

■ The Court must analyze the character of the words used in *Hit Man*, using the appropriate standard, and then decide whether that type of speech is protected by the First Amendment. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 505, 104 S.Ct. 1949, 1962, 80 L.Ed.2d 502 (1984). The Court finds that, of the five classes of speech which states may proscribe within First Amendment guidelines, the only one under which Plaintiffs could conceivably maintain this action is incitement to imminent, lawless activity under *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). *See, e.g., Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); *DeFilippo*

**3.** *See Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 575–79, 97 S.Ct. 2849, 2857–59, 53 L.Ed.2d 965 (1977) (holding that First Amendment did not protect defendants from liability under the common-law tort of "appropriation" or "right of publicity" when news media filmed plaintiff's "human cannonball" act at a county fair and broadcast the act without the plaintiff's permission, and reasoning that it was enough that defendants knew that the plaintiff objected to the broadcast and went forward anyway); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 667–72, 111 S.Ct. 2513, 2517–20, 115 L.Ed.2d 586 (1991) (holding that the First Amendment does not bar application of ordinary principles of state contract and promissory estoppel law in suit against newspaper for breaching promise of confidentiality and printing a source's name);

*Goldstein v. California*, 412 U.S. 546, 571, 93 S.Ct. 2303, 2316–17, 37 L.Ed.2d 163 (1973) (upholding California's "record piracy" law, noting that "[n]o restraint has been placed on the use of an idea or concept"); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 568, 105 S.Ct. 2218, 2234, 85 L.Ed.2d 588 (1985) (upholding copyright infringement action against *The Nation* magazine for printing excerpts from President Gerald Ford's memoirs, holding that the First Amendment did not shield the magazine from the normal principles of copyright liability); *Snepp v. United States*, 444 U.S. 507, 511–16, 100 S.Ct. 763, 766–69, 62 L.Ed.2d 704 (1980) (upholding constructive trust on defendants' book royalties for book published in violation of preclearance agreement with CIA).

*v. National Broadcasting Co.,* 446 A.2d 1036, 1040 (R.I.1982).

In *Brandenburg,* a Ku Klux Klan leader was convicted under the Ohio criminal syndicalism statute for assembling with others at a rally and saying, among other things:

> "We're not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible there might have to be some revengeance taken."

*Id.,* 395 U.S. at 446, 89 S.Ct. at 1829.

The statute at issue in that case prohibited:

> "[A]dvocat[ing] ... the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform ... and voluntarily assembl[ing] with any society, group, or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism."

The Supreme Court reversed the conviction holding that:

> The constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

395 U.S. at 447, 89 S.Ct. at 1829.

The Supreme Court distinguished between speech which merely advocates law violation and speech which incites imminent lawless activity; the former is protected, but the latter is not. *Id.* at 448, 89 S.Ct. at 1830. The court reasoned that a statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. *Id.* The court found that the words spoken by the Klansman amounted to mere advocacy, and the statute which punished such speech was unconstitutional. *Id.* at 449, 89 S.Ct. at 1830–31.

■ The Court must decide, therefore, whether *Hit Man* merely advocates or teaches murder or whether it incites or encourages murder. *Id.* The Court must examine not only the content of the speech in this case, but also the context in which it was disseminated. *See, e.g., Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 66, 96 S.Ct. 2440, 2450, 49 L.Ed.2d 310 (1976) ("[T]he line between permissible advocacy and impermissible incitation to crime or violence depends, not merely on the setting in which the speech occurs, but also on exactly what the speaker had to say."); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 915 n. 50, 102 S.Ct. 3409, 3427 n. 50, 73 L.Ed.2d 1215 (1982) ("... [T]he question is one of alleged trespass across 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated' ... In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see' ... whether they are of a character which the principles of the First Amendment ... protect") (citations omitted).

Plaintiffs argue that the *Brandenburg* standard is not a First Amendment "universal," applied in all cases implicating free speech doctrine. Paper No. 22 at 23. According to Plaintiffs, the Supreme Court has not attempted to jam all free speech analysis into the "incitement" standard of *Brandenburg;* rather, such analysis is only used in cases dealing with speech on issues of social or political concern, usually in the context of demonstrations and rallies, in which authorities are concerned that matters are about to erupt into violence. Paper No. 22 at 24. This argument fails for two reasons.

First, the *Brandenburg* standard is the appropriate standard in this case because it involves speech which advocates or teaches lawless activity, in this case murder. Secondly, Plaintiffs are correct in pointing out that the *Brandenburg* standard has most often been applied in cases involving political speech. *See, e.g., NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 915, 102 S.Ct. 3409, 3426–27, 73 L.Ed.2d 1215 (1982) (stating that political speech lies at the core of the First Amendment); *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293–94, 65 L.Ed.2d 263 (1980) (indicating that expression on public issues has always rested on the highest rung of the hierarchy of First

Amendment values). However, this standard is not inherently limited to political speech cases. *See, e.g., DeFilippo v. National Broadcasting Co.*, 446 A.2d 1036, 1040 (R.I. 1982) (parents of a deceased minor brought wrongful death action against NBC after their son hanged himself while imitating a hanging stunt he observed on the Johnny Carson Show); *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017 (5th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988) (court reversed jury's award of damages in a wrongful death action against a magazine publisher for adolescent's death allegedly caused by article which described practice of autoerotic asphyxia); *Yakubowicz v. Paramount Pictures Corp.*, 404 Mass. 624, 536 N.E.2d 1067 (1989) (wrongful death action by father of boy slain by person who had just seen the film *The Warriors*, which depicted scenes of gang violence, dismissed despite the fact that the perpetrator uttered a line from the film while committing the homicide); *Zamora v. C.B.S., Inc.*, 480 F.Supp. 199 (S.D.Fla.1979) (fifteen-year-old unsuccessfully sued television networks for violent programming that allegedly caused him to commit criminal acts); *McCollum v. CBS Inc.*, 202 Cal.App.3d 989, 249 Cal.Rptr. 187 (Ct.App.1988) (Ozzy Ozbourne record that included song "Suicide Solution," which exhorted suicide found not actionable); *Olivia N. v. NBC, Inc.*, 126 Cal.App.3d 488, 178 Cal.Rptr. 888 (Ct.App.1981), *cert. denied*, 458 U.S. 1108, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982) (girl raped with bottle by teenaged girls imitating similar incident depicted on television drama, *Born Innocent*, could not state valid cause of action).

The Court believes that the instant case is very similar to these cases involving violent movies and television programs that were alleged to have caused physical injury or death. *See, e.g., Zamora v. C.B.S. Inc.*, 480 F.Supp. 199 (S.D.Fla.1979); *Yakubowicz v. Paramount Pictures Corp.*, 404 Mass. 624, 536 N.E.2d 1067 (1989). Although the programs involved in these cases were not considered to have a "how-to" format like the subject book, they were considered depictions of violence alleged to have been imitated. *See, e.g., Yakubowicz*, 536 N.E.2d at 1068; *Zamora*, 480 F.Supp. at 200. The

Court sees no difference. In these cases, the court examined the speech using the *Brandenburg* standard and determined that it did not constitute incitement.

For example, in *Yakubowicz*, a father whose son was killed by a minor who had attended a showing of the film "The Warriors" brought a wrongful death action against the distributor of the movie, Paramount Pictures. The court, ruling for the defendants on a motion for summary judgment, said:

> Although the film is rife with violent scenes, it does not at any point exhort, urge, entreat, solicit, or overtly advocate or encourage unlawful or violent activity on the part of viewers. It does not create the likelihood of inciting or producing "imminent lawless action" that would strip the film of First Amendment protection.

*Id.*, 536 N.E.2d at 1071 (citing *Brandenburg*, 395 U.S. at 447, 89 S.Ct. at 1829–30). Plaintiffs have done little to persuade the Court that these cases are not applicable.

Plaintiffs argue that these "copycat" or "imitative harm" cases do not apply because, unlike in this case, the publisher or broadcaster in these cases did not intend that others follow or act upon their depictions. Paper No. 22 at 42. In this case, the Plaintiffs argue, Defendants conceded that they intended that their publications would be used by criminals to plan and execute murder as instructed in the manual. Paper No. 18 at 14; J.S. ¶¶ 4.b, 5.a & 5.b. However, Defendants clarify their concession by explaining that when they published, advertised and distributed both *Hit Man* and *Silencers*, they knew, and in that sense "intended," that the books would be purchased by all of the categories of readers previously described and used by them for the broad range of purposes previously described. *Id.*

■ Furthermore, in order to justify a claim that speech should be restrained or punished because it was an incitement to lawless action, the court must be satisfied that the speech (1) was directed or intended toward the goal of producing imminent lawless conduct and (2) was likely to produce such imminent conduct. *McCollum v. CBS Inc.*, 202 Cal.App.3d 989, 249 Cal.Rptr. 187,

193 (1988) (citing *Hess v. Indiana,* 414 U.S. 105, 108, 94 S.Ct. 326, 328–29, 38 L.Ed.2d 303 (1973)).

For example, in *McCollum,* Plaintiffs sued Ozzy Osbourne, a musical performer, and CBS Records, Inc. when their decedent was allegedly caused to commit suicide while listening to a song entitled "Suicide Solution." *Id.,* 249 Cal.Rptr. at 191. In finding that there was no intent to produce imminent lawless action, the court reasoned that:

> [T]here is nothing in any of Osbourne's songs which could be characterized as a command to an immediate suicidal act. None of the lyrics relied upon by plaintiffs, even accepting their literal interpretation of the words, purport to order or command anyone to any concrete action at any specific time, much less immediately.

*Id.,* 249 Cal.Rptr. at 193.

While the Defendants have conceded that they intended for their books to be purchased and actually used by criminals, they have not conceded to the requisite intent. Under *Brandenburg,* the Defendants must have intended imminent lawless action. *See, e.g., McCollum,* 249 Cal.Rptr. at 193. In other words, Defendants must have intended that James Perry would go out and murder Mildred Horn, Trevor Horn, and Janice Saunders *immediately. Id.* That did not happen in this case since the parties have stipulated to the fact that James Perry committed these atrocious murders a year after receiving the books. J.S. ¶¶ 2, 6. Just as in *McCollum,* nothing in *Hit Man* and *Silencers* could be characterized as a command to immediately murder the three victims. *Id.*

Plaintiffs also argue that even if *Brandenburg* applies, that standard does not bar liability in this action. Paper No. 22 at 7.

According to Plaintiffs, the three components of the *Brandenburg* test have been met: 1) intent, 2) imminence, and 3) likelihood. Paper No. 22 at 8. The Court disagrees. First, as discussed above, the intent to which Defendants have conceded is irrelevant to the Court's analysis. Furthermore, there is no evidence that Defendants intended imminent lawless activity. Secondly, the Court has read the book and concludes that, although morally repugnant, it does not constitute incitement or "a call to action." *Zamora v. Columbia Broadcasting System,* 480 F.Supp. 199, 204 (S.D.Fla.1979) (citing *Yates v. United States,* 354 U.S. 298, 322, 77 S.Ct. 1064, 1078–79, 1 L.Ed.2d 1356 (1957)).

Nothing in the book says "go out and commit murder now!" Instead, the book seems to say, in so many words, "if you want to be a hit man this is what you need to do." This is advocacy, not incitement. Advocacy is defined as mere abstract teaching. *Brandenburg,* 395 U.S. at 448, 89 S.Ct. at 1830 (citing *Noto v. United States,* 367 U.S. 290, 297–298, 81 S.Ct. 1517, 1520–1521, 6 L.Ed.2d 836 (1961) ( … mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steering it to such action)). The Court finds that the book merely teaches what must be done to implement a professional hit.[4] The book does not cross that line between permissible advocacy and impermissible incitation to crime or violence. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 66, 96 S.Ct. 2440, 2450, 49 L.Ed.2d 310 (1976). The book does not purport to order or command anyone to any concrete action at any specific time, much less immediately. *Yakubowicz,* 404 Mass. 624, 536 N.E.2d 1067,

---

4. The title of each chapter listed in the Table of Contents indicates the instructive nature of *Hit Man* as opposed to incitement to imminent lawless activity:

**Chapter One:** The Beginning—Mental and Physical Preparation
**Chapter Two:** Equipment—Selection and Purpose
**Chapter Three:** The Disposable Silencer—A Poor Man's Access to a Rich Man's Toy
**Chapter Four:** More Than One Way to Kill a Rabbit—The Direct Hit Is Not Your Only Alternative
**Chapter Five:** Homework and Surveillance—Mapping a Plan and Checking It for Accuracy
**Chapter Six:** Opportunity Knocks—Finding Employment, What to Charge, What to Avoid
**Chapter Seven:** Getting the Job Done Right—Why the Described Hit Went Down the Way It Did
**Chapter Eight:** Danger! Ego, Women and Partners—Controlling Your Situation
**Chapter Nine:** Legally Illegal—Enjoying the Fruits

1071 (1989) (citations omitted); *McCollum v. CBS Inc.*, 202 Cal.App.3d 989, 249 Cal.Rptr. 187, 193 (Ct.App.1988).

Nor does the book have a tendency to incite violence. The Court notes that out of the 13,000 copies of *Hit Man* that have been sold nationally, one person actually used the information over the ten years that the book has been in circulation. *See DeFilippo v. National Broadcasting Co.*, 446 A.2d 1036, 1041 (R.I.1982). The Court also notes that the advertisement in Paladin's mail order catalogue contains the disclaimer "[f]or academic study only." The book itself also contains, in part, the disclaimer "[f]or information purposes only!" This does not indicate a tendency to incite violence. To the contrary, such disclaimers may be interpreted as an attempt to dissuade readers from engaging in the activity it describes. *See Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1024 (5th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988).

The context of the information contained in *Hit Man* and *Silencers* is also significant. The deadly information is contained in books that presumably take time to read. The books are available to an unlimited number of people at different times. At worst the books amount to nothing more than advocacy of illegal action at some indefinite future time. Under these circumstances, it is difficult to find that the books constitute incitement to imminent, lawless activity. *Hess v. Indiana*, 414 U.S. 105, 109, 94 S.Ct. 326, 329, 38 L.Ed.2d 303 (1973) ("And since there was no evidence, or rational inference from the import of the language, that his words were intended to produce, and likely to produce, *imminent* disorder, those words could not be punished by the State on the ground that they had a 'tendency to lead to violence' ").

The Court finds, therefore, applying the standard in *Brandenburg*, and considering the content and the context of the speech in *Hit Man*, that the book does not constitute incitement to imminent lawless action.

While the books have proven to contain information which, when it makes its way into the wrong hands, can be fatal, First Amendment protection is not eliminated simply because publication of an idea creates a potential hazard. *Herceg*, 814 F.2d at 1020. It is simply not acceptable to a free and democratic society to limit and restrict creativity in order to avoid dissemination of ideas in artistic speech which may adversely affect emotionally troubled individuals. *Yakubowicz*, 536 N.E.2d at 1072 (citing *McCollum v. CBS, Inc.*, 202 Cal.App.3d at 1005–1006, 249 Cal.Rptr. 187).

### D. *Soldier of Fortune Cases*

Plaintiffs also urge the Court to be guided by the decisions in the *Soldier of Fortune* cases. *See, e.g., Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110 (11th Cir. 1992), *cert. denied*, 506 U.S. 1071, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993); *Norwood v. Soldier of Fortune Magazine, Inc.*, 651 F.Supp. 1397 (W.D.Ark.1987). The courts in these cases upheld actions for damages against *Soldier of Fortune* magazine for deaths resulting from the magazine's "gun for hire" advertisements. The defendants in these cases tried unsuccessfully to use the First Amendment as a defense. The Court finds, however, that these cases are inapposite because they involve commercial speech which is afforded limited first amendment protection. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, et al.*, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558–59, 37 L.Ed.2d 669 (1973).

Finally, as the Court noted earlier, this is a novel case with unprecedented future implications. Whether there is a substantial connection or a causal nexus between a publication similar to the material in question and the ultimate acts of criminal defendants who are driven with *animus malus* and criminal intent, so as to support civil liability against the publishing company, has yet to be determined.[5] Moreover, the Court suspects that there are a myriad of other complex issues

---

**5.** The Court notes further that it has grave reservations as to whether a theory of products liability, as set forth in *Kelley v. R.G. Industries, Inc.*, 304 Md. 124, 497 A.2d 1143 (1985), would result in strict liability in this case because courts have held that a book is not a product for purposes of products liability law. *See, e.g., Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991).

now emerging and which have been spawned by recent electronic technologies, including the Internet and related modes of communication. What is unequivocal, however, is the extensive history throughout this country of permitting the free, open and competitive dissemination of information and ideas. This privilege [and concomitant shield against threats of civil suits] has long been an integral part of the fabric of this nation, and as such has been tenaciously protected by the Courts. As explained in an often quoted statement:

> The constitutional protection accorded to the freedom of speech and of the press is not based on the naive belief that speech can do no harm but on the confidence that the benefits society reaps from the free flow and exchange of ideas outweigh the costs society endures by receiving reprehensible or dangerous ideas.

*Herceg,* 814 F.2d at 1019.

### IV. *Conclusion*

The Court read *Hit Man* in its entirety. Its content is enough to engender nausea in many readers. This Court, quite candidly, personally finds the book to be reprehensible and devoid of any significant redeeming social value. Nevertheless, however loathsome one characterizes the publication, *Hit Man* simply does not fall within the parameters of any of the recognized exceptions to the general First Amendment principles of freedom of speech. The Court, likewise, declines Plaintiffs invitation to create a new category of speech unprotected by the First Amendment—speech that arguably aids and abets murder.

In summary, the Court believes that Plaintiffs have not made a sufficient showing on this record, as a matter of law, to support their claim that the maintenance of this suit for damages does not infringe upon the First Amendment protection of speech. Accordingly, the Court will grant summary judgment for Defendants.[6]

---

6. Although the Defendant, Peter Lund, has not yet submitted to the jurisdiction of this Court and technically is not before the Court nor is included as the mover of the motions for summary judgment, the Court believes that resolution herein would be dispositive of claims against

A separate Order consistent with this Opinion will issue.

### *AMENDED ORDER*

For the reasons set forth in the attached Amended Memorandum Opinion, IT IS, this 6th day of September, 1996, by the United States District Court for the District of Maryland, hereby ORDERED:

1. That the previous Memorandum Opinion and Order dated August 30, 1996, BE, and the same hereby IS, VACATED;

2. That the Defendant's (Paladin Enterprises, Inc.) consolidated Motions for Summary Judgment BE, and the same hereby ARE, **GRANTED;**

3. That Judgment BE, and the same hereby IS **ENTERED** for the Defendant; and

4. That the Clerk of the Court **CLOSE** these cases.

him. Nevertheless, the Order only affects the consolidated motions filed by the Defendant, Paladin Enterprises, Inc., and is without prejudice as to the defendant, Peter Lund, should he later be served and found to be subject to the personal jurisdiction of this Court.