[No. A090755. First Dist., Div. Three. Oct. 23, 2001.]

In re RYAN N., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
RYAN N., Defendant and Appellant.

**COUNSEL**

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Rene A. Chacon and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

McGUINESS, P. J.—Ryan N., a juvenile at the time of the incidents at issue in this criminal case, appeals from juvenile court findings and orders sustaining a petition under Welfare and Institutions Code section 602 alleging he had willfully and deliberately aided, advised or encouraged a suicide in violation of Penal Code section 401.[1] He contends (1) there is insufficient evidence to support the finding of guilt as a matter of law, because there is no evidence he ever furnished a means whereby the victim could actually commit suicide; and (2) the trial court prejudicially violated his constitutional due process and confrontation rights by limiting his cross-examination

---

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

of the victim. The unusual factual circumstances of this case present issues of criminal law and statutory interpretation which are questions of first impression.

We conclude the petition was wrongly sustained against appellant under section 401 because the victim's attempt to commit suicide in fact failed, despite appellant's active encouragement and furnishing of the intended means of suicide. However, on the basis of the substantial factual evidence in the record, we hold as a matter of law that appellant's actions amounted to a culpable *attempt* deliberately to aid, advise or encourage another to commit suicide. In addition, we conclude the trial court did not unconstitutionally limit appellant's cross-examination of the victim or violate his right to confront the witnesses against him. We therefore reverse and remand with orders that the juvenile court's findings be modified to reflect a true finding of attempted violation of section 401.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 15, 1999, Christine T., one of appellant's acquaintances, was in her car with appellant and another friend named Mark W. At some point, after the two boys had suggested "block[ing] off the parking lot with some random orange cones they had stolen," Christine "got really upset and . . . really mad [and] just stormed out and told them [she] was going to go jump off a bridge." She got out of the car and went to a friend's house. Although she said she felt "stranded," Christine also testified the two boys had not driven off immediately, and her car was "still in sight" when she left the area.

Between 7:30 and 8:00 a.m. the next day, November 16, Christine saw appellant driving her car on Burlingame Avenue. He stopped, and let her into the driver's seat. Christine drove off with appellant in the passenger's seat. Appellant was "mad" at Christine because she "was filing a police report reporting the car was stolen." She "was feeling depressed and exceptionally suicidal." As they drove around, Christine told appellant "I don't even want to live anymore." According to Christine, appellant responded, "[t]hen you shouldn't," "[t]hen don't," or "[s]omething along those lines." Christine began speculating on "what I could do to kill myself." When she suggested ingesting something "like possibly sleeping pills," appellant "said that that would probably be a painless way." The two "joked around" about the afterlife. When Christine asked appellant if he would miss her when she was dead, he said, "No." When she expressed hurt, appellant said "he wouldn't even care no matter who it was."

Under cross-examination, Christine testified that she could not remember appellant's exact response to her statement that she did not want to live,

except that he did not try to talk her out of it. She was "hurt" that "someone could be so cold." She could not remember how the subject of sleeping pills came up, except that they "both kind of agreed it would be a painless way," and "once I had taken them, no one could stop me from dying after that." Appellant did not indicate to Christine that he knew much about sleeping pills, and Christine acknowledged that they were both "kind of ignorant" on the subject.

Christine and appellant drove to a Walgreens store in Millbrae. She could not remember whose idea it was to go there. At the store, Christine stole a bottle of 50 Nytol tablets by putting it in her pocket. Appellant purchased a second bottle containing 50 Nytol tablets as well as a bottle of something to drink. The two then returned to the car. Appellant got in the driver's seat, and Christine got into the passenger's seat. Appellant combined the two bottles of Nytol pills in one container and handed the combined bottle of 100 Nytol pills to Christine. As they drove from Millbrae down Crystal Springs Road, Christine began ingesting the Nytol pills "one at a time." Appellant said: "Hurry up and take them all quickly, otherwise it won't work," or words to that effect. Although up to this point Christine had not been completely serious about wanting to die and was in "more of a cry for help kind of situation," "[a]t that moment [she] didn't care anymore." Christine ingested the rest of the pills. When she asked how long she would live after having taken the pills, appellant said, "one to two hours." As she started to feel "groggy and sleepy," she took off her necklace and handed it to appellant before losing consciousness. The next thing she could remember was awakening in the intensive care unit of San Mateo County General Hospital, where she remained for one day and in the psychiatric ward for an additional six days thereafter.

Christine identified a suicide note as being in her handwriting and bearing her signature. Although she could not remember writing it, she "assume[d]" she wrote it after she had taken the Nytol pills. The note contained short messages to several people, including appellant. In addition to calling her parents "horrible" persons and blaming them for her suicide, Christine's note addressed appellant as follows: "I love you! Sorry I'm just a fucked up piece of pink goo. Your [sic] the most amazing person I ever met. I'm going to haunt your ass. . . . [¶] . . . [¶] P.S. Ryan [N.] gets my car."[2] Under cross-examination, Christine could not explain why she wrote this note,

---

[2] As pertinent to this case, the handwritten suicide note read as follows: "To all the people I know;

"Mom—

"This is all your fault. You are a horrible mother and a horrible person.

"Dad—

except to say that she was "upset" with her parents because she felt "they had let [her] down," and she had wanted them "to feel bad" and responsible for her suicide. Shown the note by police when she awakened at the hospital, Christine was unable to explain it and could not remember writing it. She lied to the police about the bottle of pills she had stolen, claiming instead that appellant had purchased both bottles. Once she realized how close she had actually come to dying, she "felt extremely betrayed" by appellant. She told her parents that her attempted suicide would not have occurred if not for appellant's involvement.

Testifying on appellant's behalf, Mark W. stated that on November 15, 1999, the day before the incident, he and appellant were driving around with Christine in her car. At some point, Christine stopped the car and threatened "to go jump off the bridge." According to Mark, Christine's "drama queen" behavior was "[n]othing out of the ordinary." At that point in her life, Christine had been "kicked out of her house" and "was living in a car." However, at that point "[s]he seemed to be doing okay." Neither Mark nor appellant took Christine's suicidal threats seriously. As they watched, Christine "just walked off." The two boys then drove away, and appellant dropped Mark off at the latter's house. Under cross-examination, Mark testified that he thought Christine was "impressionable," and not the type of person to kill herself without help or encouragement.

Testifying in his own defense, appellant stated that at the time of the incident he and Christine were "good friends." On November 15, 1999, Christine picked him and Mark up at their respective houses, and then "drove around" for about six hours. During this time, Christine "was getting really upset." However, she did not say anything about wanting to kill herself until she pulled into a motel parking lot, got out of the car, and said: "I am going to go jump off the bridge. You take the car. I don't care. Do whatever you want with it." Christine then "walked off." Appellant did not take her seriously, because "[s]he said that so many times before it's not even funny . . . ." After Christine "disappeared," appellant "decided to drop Mark off and just take the car home" himself. Appellant explained: "[S]he had told me that she was giving me the car and I didn't take it

---

"Your [sic] almost as bad as she is. You knew how much [S.] ment [sic] to me and you lied to me. Fuck you both. [¶] . . .

"Ryan [Appellant]—

"I love you! Sorry I'm just a fucked up piece of pink goo. Your [sic] the most amazing person I ever met. I'm going to haunt your ass. [¶] . . .

"For those of you who can't understand why I did this, you obviously don't know me. I just can't stand the pain anymore. I hope my parents rot in hell.

"[/s/] Christine [T.]

"P.S. [Appellant] Ryan [N.] gets my car."

seriously. I just wanted to kind of like teach her a lesson, like not to play around like that because it's not funny. She said she was going to kill herself, I could take the car, so I did."

The next morning, Christine telephoned appellant as he was getting ready to go to school, asked why he had taken her car, and told him to pick her up near Burlingame Avenue. Afraid that she would call the police, appellant drove to that location, where he found Christine talking with a police officer. After appellant talked with the police officer and gave him an explanation, Christine got in the car and drove away, with appellant in the passenger's seat. Appellant was "angry" with Christine "for playing games" with him. After driving around for "[a] few hours," Christine started talking about suicide and saying "all this stupid stuff" about "coming back like a butterfly or something." Christine drove to Walgreens where she stole two 50-pill boxes of Nytol. Appellant purchased two boxes of Nytol for himself "[b]ecause I have trouble sleeping."

When they left Walgreens, appellant asked Christine if he could drive. She said yes and gave him the keys. As they drove off, with appellant at the wheel, Christine "started popping" Nytol pills. There was no discussion about why she was taking the pills; appellant assumed "[s]he was just trying to get messed up, get high, you know." He never thought the pills "could even come close to like killing her." Appellant thought she only took about 40 or 50 pills, one after the other. Appellant "absolutely" denied ever encouraging Christine to kill herself, or telling her anything to the effect that she should take all the pills at once or her suicide attempt would not work. As they were driving southbound on El Camino, Christine told appellant "she had to use the bathroom." They stopped at the Hillsdale shopping center. After Christine did not return for about 40 minutes, appellant went to look for her and found her on the ground surrounded with security personnel. Appellant gave Christine's driver's license to a security guard and stayed until the paramedics arrived. Then he left in her car. He heard nothing more about Christine until three or four days later when the police came to his home.

On November 23, 1999, the San Mateo County District Attorney filed a Welfare and Institutions Code section 602 petition charging appellant with unlawfully taking an automobile (count one) (Veh. Code, § 10851, subd. (a)) and unlawfully aiding, advising or encouraging Christine to commit suicide (count two) (§ 401). At the jurisdictional hearing, the trial court dismissed the first count on the prosecution's motion, and found true the allegations in count two. Because appellant and his parents lived in San Francisco, the case was transferred to the San Francisco County Juvenile Court for disposition.

After a psychological evaluation was made and a probation report prepared, on March 9, 2000, the juvenile court placed appellant on probation, ordered psychological counseling, and imposed a 90-day stayed commitment to juvenile hall. Fines and other monetary penalties were also imposed. This appeal timely followed.

### SUFFICIENCY OF EVIDENCE TO PROVE A VIOLATION OF SECTION 401

██ The principal issue on this appeal is whether there was sufficient evidence to prove appellant deliberately aided, advised or encouraged Christine to commit suicide in violation of section 401. Appellant contends as a matter of law there was no evidence he ever furnished a means whereby Christine could commit suicide, as a result of which the evidence of his guilt is necessarily insufficient to support the trial court's finding. His argument focuses on the failure of the prosecution to present any evidence that Nytol, in any amount, is potentially lethal, and thus a means by which one could effectively commit suicide. Not directly addressed by the parties in their original briefs is what may be considered the threshold question of whether a defendant may be convicted of aiding, advising or encouraging an *attempt* to commit suicide that does not actually result in death. Because of the failure of either party to address this issue, we requested supplemental briefing. These important questions of criminal law and statutory interpretation are apparently issues of first impression.

### STANDARD OF REVIEW

██ As a preliminary matter, we note that on this appeal challenging the sufficiency of the evidence to support a juvenile court judgment sustaining the criminal allegations of a petition made under the provisions of section 602 of the Welfare and Institutions Code, we must apply the same standard of review applicable to any claim by a criminal defendant challenging the sufficiency of the evidence to support a judgment of conviction on appeal. Under this standard, the critical inquiry is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560].) An appellate court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)

In reviewing the evidence adduced at trial, our perspective must favor the judgment. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208 [259 Cal.Rptr. 669, 774 P.2d 698]; *People v. Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110]; *People v. Matian* (1995) 35 Cal.App.4th 480, 483-484 [41 Cal.Rptr.2d 459].) "This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.] [¶] Before the judgment of the trial court can be set aside for insufficiency of the evidence . . . , it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. [Citation.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321]; see also *People v. Johnson, supra,* 26 Cal.3d at pp. 576-577.)

 There is no question that the People's burden is a heavy one. "To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence." (*People v. Hall* (1964) 62 Cal.2d 104, 112 [41 Cal.Rptr. 284, 396 P.2d 700].) Nevertheless, even though "[e]vidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction" (*People v. Redmond, supra,* 71 Cal.2d at p. 755), this court is bound by the findings of the trier of fact where it has rejected a hypothesis pointing to innocence and there is evidence to support its implied finding that guilt is the more reasonable of the two hypotheses. Moreover, we must be ever mindful of the fact that it is the exclusive province of the trier of fact to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. (*People v. Jones, supra,* 51 Cal.3d at p. 314; *People v. Barnes, supra,* 42 Cal.3d at p. 303.) "Thus, even though the appellate court may itself believe that the circumstantial evidence might be reasonably reconciled with the defendant's innocence, this alone does not warrant interference with the determination of the trier of fact. [Citations.] Whether the evidence presented at trial is direct or circumstantial, . . . the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253]; see also *People v. Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159]; *People v. Bean* (1988) 46 Cal.3d 919, 933 [251 Cal.Rptr. 467, 760 P.2d 996]; *People v. Redmond, supra,* 71 Cal.2d at p. 755.)

Thus, in an appeal from a juvenile criminal as in any other criminal appeal, we are in no position to weigh any conflicts or disputes in the evidence. The juvenile trial court was the trier of fact and the sole judge of the credibility of witnesses; we are not. Even if different inferences can reasonably be drawn from the evidence, we cannot substitute our own inferences or deductions for those of the trial court. We must consider all of the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference from the evidence tending to establish the correctness of the trial court's decision, and resolving conflicts in support of the trial court's decision. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198]; *In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1728 [17 Cal.Rptr.2d 282]; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820 [2 Cal.Rptr.2d 429]; *In re Richard H.* (1991) 234 Cal.App.3d 1351, 1363 [285 Cal.Rptr. 917]; *In re Katrina C.* (1988) 201 Cal.App.3d 540, 547 [247 Cal.Rptr. 784]; *In re Rico W.* (1986) 179 Cal.App.3d 1169, 1173 [225 Cal.Rptr. 472].) In short, in juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination of whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, which will support the decision of the trier of fact. (*In re Rocco M., supra,* 1 Cal.App.4th at p. 820; *In re Katrina C., supra,* 201 Cal.App.3d at p. 547.)

## CRIMINALITY OF ASSISTING AN ATTEMPTED SUICIDE UNDER SECTION 401

■ Neither suicide nor attempted suicide is a crime under the criminal statutes of California or any other state. (*In re Joseph G.* (1983) 34 Cal.3d 429, 433 [194 Cal.Rptr. 163, 667 P.2d 1176, 40 A.L.R.4th 690]; *Donaldson v. Lungren* (1992) 2 Cal.App.4th 1614, 1624 [4 Cal.Rptr.2d 59]; Note, *Criminal Liability for Assisting Suicide* (1986) 86 Colum. L.Rev. 348, 350.)[3] "A majority of states, however, impose criminal penalties upon one who assists another to commit suicide. [Citations.] One reason for the existence of criminal sanctions for those who aid a suicide is to discourage those who might encourage a suicide to advance personal motives. [Citation.] Another reason is the belief that the sanctity of life is threatened by one who is willing to participate in taking the life of another, even at the victim's request. [Citation.] A third justification is that although the suicide victim may be mentally ill in wishing his [or her] demise, the aider is not necessarily mentally ill. [Citation.] [¶] These reasons justify a criminal statute

---

[3]On the other hand, at least one state (North Carolina) still appears to have a common law crime of attempted suicide. (*State v. Willis* (1961) 255 N.C. 473 [121 S.E.2d 854]; see *Donaldson v. Lungren, supra,* 2 Cal.App.4th at p. 1624; Note, *Criminal Liability for Assisting Suicide, supra,* 86 Colum. L.Rev. at p. 350, fn. 22.)

punishing the aiding and encouraging of suicide, although suicide itself is not illegal. The state's interest in such a situation involves more than just a general commitment to the preservation of human life. . . . Third parties, even family members, do not always act to protect the person whose life will end." (*Donaldson v. Lungren, supra,* 2 Cal.App.4th at p. 1624.)

In California, the statutory definition of the crime at issue is set out in section 401. This felony statute, in effect since 1873, provides as follows: "Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony."[4] The language of section 401 closely resembles that used in other parts of the Penal Code to define or describe the principal criminal liability of persons who "aid and abet" the commission of a crime, and the courts have frequently used the terms aiding and abetting interchangeably with those employed by section 401 in discussing the elements of the crime defined by that statute.[5]

■ Although on its face the statute may appear to criminalize simply giving advice or encouragement to a potential suicide, the courts have— again by analogy to the law of aiding and abetting—required something more than mere verbal solicitation of another person to commit a hypothetical act of suicide. Instead, the courts have interpreted the statute as proscribing "the *direct* aiding and abetting of a *specific suicidal act.* . . . Some *active and intentional participation* in the events leading to the suicide are required in order to establish a violation." (*McCollum v. CBS, Inc.* (1988) 202 Cal.App.3d 989, 1007 [249 Cal.Rptr. 187], first italics in original, second and third italics added.) Thus, in order to prove a violation of section

---

[4] The crime is punishable by a state prison term of 16 months, two years, or three years. (§ 18.) California is actually among the most lenient jurisdictions in its criminalization and punishment of assisted suicide. (*In re Joseph G., supra,* 34 Cal.3d at p. 435.) A minority of states continue to treat aiding a completed suicide as a form of homicide, either manslaughter or murder. (Note, *Criminal Liability for Assisting Suicide, supra,* 86 Colum. L.Rev. at pp. 350-354; see Ariz. Rev. Stat. Ann. § 13-1103(A); Conn. Gen. Stat. Ann. § 53a-56(a); Fla. Stat. Ann. § 782.08; Mont. Code Ann. §§ 45-2-201, 45-2-302, 45-5-102, 45-5-103; N.Y. Penal Law § 125.15; Or. Rev. Stat. § 163.125(1).)

[5] See, for example section 31, which provides in pertinent part as follows: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or *aid and abet* in its commission, or not being present, have *advised and encouraged* its commission, . . . are principals in any crime so committed." (Italics added.)

Despite this similarity between the concept of aiding and abetting of a crime and the "aiding, advising and encouraging" language of section 401, however, in the final analysis the two must be distinguished. Criminal "aiding and abetting" necessarily involves a referent *crime* which the defendant intends to "aid and abet." In contrast, a person who commits the crime defined by section 401 does not intend to aid and abet a crime, since suicide itself is not criminal. In the case of section 401, it is the aiding, advising and encouraging itself which is criminal. Our discussion and analysis in this case, then, is limited to the crime defined by section 401 and should not be taken to apply to criminal "aiding and abetting" in general.

401 it is necessary to establish all of the following essential elements: (1) the defendant specifically intended the victim's suicide; (2) the defendant undertook some active and direct participation in bringing about the suicide, such as by furnishing the victim with the means of suicide; and, finally, (3) the victim actually committed a specific, overt act of suicide. (*Ibid.*; *People v. Matlock* (1959) 51 Cal.2d 682, 694 [336 P.2d 505, 71 A.L.R.2d 605]; *Donaldson v. Lungren, supra,* 2 Cal.App.4th at p. 1625.)

In the leading case, our Supreme Court has explained that the key to distinguishing between homicide and the crime of aiding, advising, or encouraging a suicide "is the active or passive role of the defendant in the suicide. If the defendant merely furnishes the means, he is guilty of aiding a suicide; if he actively participates in the death of the suicide victim, he is guilty of murder." (*In re Joseph G., supra,* 34 Cal.3d at p. 436.) Any statute dealing with assisted suicide as a crime less than murder " 'does not contemplate active participation by one in the overt act directly causing death. It contemplates some participation in the events leading up to the commission of the final overt act, such as furnishing the means for bringing about death,—the gun, the knife, the poison, or providing the water, for the use of the person who himself commits the act of self-murder. But where a person actually performs, or actively assists in performing, the overt act resulting in death, such as shooting or stabbing the victim, administering the poison, or holding one under water until death takes place by drowning, his act constitutes murder, and it is wholly immaterial whether this act is committed pursuant to an agreement with the victim, such as a mutual suicide pact.' " (*People v. Matlock, supra,* 51 Cal.2d at p. 694, quoting from and relying on *People v. Bouse* (1953) 199 Or. 676, 702-703 [264 P.2d 800, 812], overruled on other grounds in *State v. Fischer* (1962) 232 Or. 558 [376 P.2d 418, 421].)

As noted by the Supreme Court in the case of *In re Joseph G.*, the Model Penal Code apparently suggests that purposefully aiding or soliciting an *attempted* suicide is an independent criminal offense. (*In re Joseph G., supra,* 34 Cal.3d at p. 437, fn. 5.)[6] In the same case, the Supreme Court referred in passing to "attempted suicide" in the context of discussing the underlying policy rationale for imposing criminal liability on aiding or encouraging

---

[6]In a footnote, the Supreme Court quoted the following language from the Model Penal Code provisions distinguishing between causing and aiding a suicide: " '(1) *Causing Suicide as Criminal Homicide.* A person may be convicted of criminal homicide for causing another to commit suicide only if he purposely causes such suicide by force, duress or deception. [¶] (2) *Aiding or Soliciting Suicide as an Independent Offense.* A person who purposely aids or solicits another to commit suicide is guilty of a felony of the second degree if his conduct causes such suicide or an attempted suicide, and otherwise of a misdemeanor.' (Model Pen. Code, § 210.5.)" (*In re Joseph G., supra,* 34 Cal.3d at p. 437, fn. 5.)

suicide instead of on suicide itself.[7] Aside from these passing references to "attempted suicide," both made in the context of quotes from other sources, the Supreme Court did not directly address the question whether section 401 itself criminalizes the conduct of a person who aids, advises or encourages a would-be suicide attempt which fails. No other California case as yet has addressed factual circumstances like those in this case, presenting the specific issue of the criminality of aiding, advising or encouraging a *failed attempt* to commit a suicide that does not result in the victim's death.[8]

 Undeterred, respondent argues that "completion" of the attempted suicide is "irrelevant" to conviction under section 401, because, "[u]nlike a homicide, the successful result of [a defendant's] actions [is] not an element of the crime." Thus, respondent insists that the fact the victim did not die does not alter the defendant's culpability under section 401 for deliberately aiding, advising or encouraging an attempt to commit suicide.

In support of its position, respondent urges that the policy reasons for punishing a defendant for aiding, advising or encouraging a suicide apply whether or not the intended suicide is actually accomplished; a defendant who provides the intended victim with some means for committing suicide, with the intent that a suicide actually occur, presents as a great a danger to

---

[7]"Finally, 'although the evidence indicates that one who *attempts* suicide is suffering from mental disease, there is not a hint of such evidence with respect to the aider and abettor. . . . [T]he justifications for punishment apply to the aider and abettor, while they do not apply to the *attempted* suicide.' [Citation.]" (*In re Joseph G., supra,* 34 Cal.3d at p. 437, italics added.)

[8]The cases cited by the parties generally concern the distinction between murder and assisted suicide, and distinguish between defendants who simply provided the means for suicide and those who went beyond the conduct proscribed by section 401 and actually committed the acts that resulted in the deaths of their victims. (See *In re Joseph G., supra,* 34 Cal.3d at pp. 431-440 [defendant and victim drove car over cliff in mutual suicide pact; held, surviving driver of vehicle guilty of no more than aiding and abetting a suicide in violation of section 401 rather than murder of deceased partner]; *People v. Matlock, supra,* 51 Cal.2d at pp. 689-694 [defendant put cord around victim's neck, victim adjusted cord, and defendant choked him; held, aiding and abetting suicide instructions properly refused since defendant "actively strangled" victim]; *People v. Cleaves* (1991) 229 Cal.App.3d 367, 374-376 [280 Cal.Rptr. 146] [defendant tied victim into position from which victim could not escape and was necessarily choked to death; held, aiding and abetting suicide instruction properly refused].) The remaining published cases cited by the parties address other factual circumstances similarly distinguishable from those before us. (See *Donaldson v. Lungren, supra,* 2 Cal.App.4th at pp. 1623-1625 [plaintiff sought state assistance in committing suicide; held, no constitutional right to receive assistance, advice or encouragement concerning suicide]; *McCollum v. CBS, Inc., supra,* 202 Cal.App.3d at pp. 1006-1007 [plaintiffs sued rock musician and recording company alleging musician's lyrics were proximate cause of teenager's suicide; held, lawsuit barred on free speech grounds and failure to demonstrate defendants actually intended decedent's suicide, as required under § 401]; *Bouvia v. Superior Court* (1986) 179 Cal.App.3d 1127, 1145 [225 Cal.Rptr. 297] [patient has right to refuse life-sustaining medical treatment, and no criminal or civil liability attaches to honoring a competent, informed patient's refusal of medical service].)

society whether or not the suicide is achieved. Indeed, respondent argues, "the Legislature's removal of assisted suicide from the general homicide statutes indicates a desire to punish the offender not because a death has occurred, but because the defendant has demonstrated a willingness to jeopardize the sanctity of life, for personal motives." Thus, by way of example, respondent asserts that a defendant who provides a victim with a gun with the intent the victim shoot and kill himself should not escape liability because of the fortuitous circumstance the victim has bad aim or is transported to a hospital in time to save his life. Respondent argues that to find such a defendant guilty only if the victim actually dies would result in the anomalous and inequitable consequence that criminal liability for the same act, committed with the exact same specific intent and mens rea, would depend on subsequent factual circumstances entirely outside the actor's control.

We are not persuaded by respondent's argument. In the first place, the allegedly anomalous and inequitable situation cited by respondent happens in every homicide case, where the nature of and punishment for the defendant's crime depends entirely on the fortuitous factual circumstance of whether or not the victim dies. Depending on the circumstances, a slight variation in the path of a bullet or the speed with which the victim receives medical attention may make all the difference between murder, attempted murder, or aggravated assault. Respondent offers no support at all for its claim that "[u]nlike a homicide, the successful result of [a defendant's] actions [is] not an element of the crime" defined by section 401. Instead, it cites to one case analyzing the crime of solicitation (*People v. Gordon* (1975) 47 Cal.App.3d 465, 474 [120 Cal.Rptr. 840] ["[t]he offense of solicitation 'is complete when the solicitation is made, and it is immaterial that the object of the solicitation is never consummated, or that no steps are taken toward its consummation' "]), and another discussing the elements of burglary (*People v. Walters* (1967) 249 Cal.App.2d 547, 550 [57 Cal.Rptr. 484] ["the crime of burglary is complete when an entry with the essential intent is made, regardless whether the felony planned is committed or not"]). Neither of the cited cases is applicable here, nor are the principles for which they stand at all apposite.

■ Solicitation is defined as an offer or invitation to another to commit a crime, with the intent that the crime be committed. The crime of solicitation, which is restricted to the solicitation of particular serious felony offenses, is complete once the verbal request is made with the requisite criminal intent; the harm is in asking, and it is punishable irrespective of the reaction of the person solicited. Thus, solicitation does not require the defendant to undertake any direct, unequivocal act towards committing the

target crime; it is completed by the solicitation itself, whether or not the object of the solicitation is ever achieved, any steps are even taken towards accomplishing it, or the person solicited immediately rejects it. (§ 653f; *People v. Swain* (1996) 12 Cal.4th 593, 605 [49 Cal.Rptr.2d 390, 909 P.2d 994]; *People v. York* (1998) 60 Cal.App.4th 1499, 1503 [71 Cal.Rptr.2d 303]; *People v. Sanchez* (1998) 60 Cal.App.4th 1490, 1494 [71 Cal.Rptr.2d 309]; *People v. Miley* (1984) 158 Cal.App.3d 25, 33-34 [204 Cal.Rptr. 347]; *People v. Adami* (1973) 36 Cal.App.3d 452, 457 [111 Cal.Rptr. 544]; *People v. Gordon, supra,* 47 Cal.App.3d at p. 474; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, §§ 31-32, 55, pp. 237-239, 264-266.)

█ The crime at issue here is clearly different from solicitation in all but the most superficial respects. Although both involve some form of criminal suggestion or encouragement by the defendant to another person, there the similarity ends. By definition, the target of solicitation is necessarily a crime itself; indeed, by statute in California that target crime must be a serious felony. On the other hand, the target of the crime defined by section 401 is suicide, which by itself is not a crime at all. (*In re Joseph G., supra,* 34 Cal.3d at pp. 433-437.) Again, unlike criminal solicitation, the crime of aiding, advising or encouraging a suicide requires *both* a specific intent that another person commit suicide, and some direct, unequivocal action aimed at bringing the suicide about. (*Donaldson v. Lungren, supra,* 2 Cal.App.4th at p. 1625; cf. *People v. Swain, supra,* 12 Cal.4th at p. 605.) Finally, unlike solicitation, which is completed merely by giving a suggestion, encouragement or advice that a hypothetical crime be committed, regardless of what then transpires, the crime at issue requires the direct aiding, advising or encouraging of an actual, specific, overt act of suicide. (*In re Joseph G., supra,* 34 Cal.3d at p. 436; *People v. Matlock, supra,* 51 Cal.2d at p. 694; *McCollum v. CBS, Inc., supra,* 202 Cal.App.3d at p. 1007.) In sum, the law of solicitation is distinguishable from the crime at issue here, and does not provide guidance in this case.

The elements of the crime of burglary are similarly irrelevant to our inquiry. Burglary is defined by statute as the entry of any of a number of enumerated private spaces, "with *intent* to commit grand or petit larceny or any felony." (§ 459, italics added.) Unlike the crime defined by section 401, felonious intent is itself incorporated in the very definition of the crime of burglary. Thus, the two elements of entry of a defined space and the essential felonious intent are not only necessary, but *sufficient* to complete the crime of burglary, whether or not the intended felony is actually committed. (*People v. Walters, supra,* 249 Cal.App.2d at p. 550.)

In contrast, there is nothing in section 401 to indicate actual accomplishment of the intended suicide is *not* a necessary element of the crime of

aiding, advising or encouraging a suicide, or that mere intent to assist a suicide and participation in bringing about a suicide attempt are by themselves sufficient for conviction. As seen, the courts interpreting section 401 have consistently treated the crime it defines as requiring active and intentional participation in events leading to the commission of an actual, *overt act* of suicide. (*In re Joseph G., supra,* 34 Cal.3d at p. 436; *People v. Matlock, supra,* 51 Cal.2d at p. 694; *McCollum v. CBS, Inc., supra,* 202 Cal.App.3d at p. 1007.) Moreover, nearly every case considering section 401 has indicated that the defendant's culpable participation may take the form of furnishing the victim with some potentially lethal instrumentality or means actually capable of producing death. (*In re Joseph G., supra,* 34 Cal.3d at pp. 435-436 [§ 401 contemplates " 'some participation in the events leading up to the commission of the final overt act, such as furnishing the means for bringing about death—the gun, the knife, the poison, or providing the water, for the use of the person who himself commits the act of self-murder . . .' "]; *People v. Matlock, supra,* 51 Cal.2d at p. 694 [same]; *Donaldson v. Lungren, supra,* 2 Cal.App.4th at p. 1625 [§ 401 "require[s] affirmative and direct conduct such as furnishing a weapon or other means by which another could physically and immediately inflict a death-producing injury upon himself"]; *McCollum v. CBS, Inc., supra,* 202 Cal.App.3d at p. 1007 [same]; *Bouvia v. Superior Court, supra,* 179 Cal.App.3d at p. 1145 [crime of aiding a suicide requires "affirmative, assertive, proximate, direct conduct such as furnishing a gun, poison, knife, or other instrumentality or usable means by which another could physically and immediately inflict some death-producing injury upon himself"].)

■ The language of the statute itself does not support respondent's interpretation. The Legislature did not use the words "attempt" or "attempted" with reference to suicide or otherwise; nor does section 401 in any way suggest that a defendant may be convicted of aiding, advising or encouraging another person's failed or incomplete attempt to commit suicide. To the contrary, on its face the plain language of the statute is limited to situations in which the victim actually accomplishes his or her own suicide. In construing a statute, it is our role "simply to ascertain and declare what is in the terms or in substance contained in the statute, not to insert what has been omitted . . . ." (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 331 [85 Cal.Rptr.2d 86].) Indeed, in the case of a penal statute, any omission evinces a legislative intent *not* to punish the omitted act. (*In re James M.* (1973) 9 Cal.3d 517, 522 [108 Cal.Rptr. 89, 510 P.2d 33].) This court long ago specifically interpreted section 401 as intended to "recognize the responsibility of a third person for helping to *cause a suicide.*" (*Tate v. Canonica* (1960) 180 Cal.App.2d 898, 903 [5 Cal.Rptr. 28], italics added (Duniway, J.).) Had the Legislature wished to criminalize

aiding, advising or encouraging an *attempted* but uncompleted suicide, it could and should have explicitly so stated.[9]

Thus, because the language of section 401 is clear and unambiguous on its face, any attempt to expand its purview to include assisting an attempted suicide would be tantamount to judicial legislation. (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 323 [87 Cal.Rptr.2d 423, 981 P.2d 52] ["[w]hen the language of a statute or constitutional provision is clear and unambiguous, judicial construction is not necessary and the court should not engage in it"].) We therefore hold that section 401 criminalizes aiding, advising or encouraging a suicide only when the victim actually kills him or herself. In this case, since the victim failed in her attempt to commit suicide and undisputedly did not die, under any view of the evidence in the record appellant could not be responsible for helping to cause a suicide, as required for culpability under the applicable criminal statute. For this reason, we conclude that appellant was wrongly found to have violated section 401.

### Liability for Attempted Commission of Assisted Suicide

 Our inquiry nevertheless does not end here. Rather than debating whether the language of section 401 should be extended to cover conduct like appellant's in aiding, advising or encouraging an attempted·but uncompleted suicide, it is far more useful and appropriate to address the somewhat different question whether a defendant may be convicted of a failed attempt to commit the crime actually defined by that statute. In other words, accepting the premise that an attempt to commit a crime is itself a crime, to what

---

[9]In this regard, it is significant that numerous other jurisdictions have statutes which *do* specifically provide that a defendant accused of aiding or advising another to commit suicide *is* criminally liable whether the suicide is completed or is only attempted. (Del. Code Ann. tit. 11, § 645; Ind. Code Ann. § 35-42-1-2.5; Kan. Stat. Ann. § 21-3406; Me. Rev. Stat. Ann. tit. 17-A, § 204; Minn. Stat. Ann. § 609.215; Miss. Code Ann. § 97-3-49; Mont. Code Ann. §§ 45-2-201, 45-2-302, 45-5-102, 45-5-103, 45-5-105; Neb. Rev. Stat. § 28-307; N.H. Rev. Stat. Ann. § 630:4; N.J. Stat. Ann. § 2C:11-6; N.Y. Penal Law §§ 120.30, 125.15; Okla. Stat. tit. 21, §§ 813- 815; 18 Pa. Cons. Stat. § 2505; Tex. Penal Code § 22.08; Wash. Rev. Code § 9A.36.060.) In two of these states, assistance given to a completed suicide is treated as a form of *homicide*, while assistance given to a suicide *attempt* is treated as a unique offense other than homicide. (Mont. Code Ann. §§ 45-2-201, 45-2-302, 45-5-102, 45-5-103, 45-5-105; N.Y. Penal Law §§ 120.30, 125.15.) At least two more of these states specify different punishments depending upon whether or not the suicide was completed. (Okla. Stat. tit 21, §§ 817-818 [aiding a suicide is punishable by "not less than seven (7) years" in prison, while "aiding an attempt at suicide" is punishable by "not exceeding two (2) years" in prison *or* by a fine not exceeding $1,000 or both]; Minn. Stat. Ann. § 609.215 [aiding a suicide is punishable by 15 years in prison while aiding an attempted suicide is punishable by 7 years in prison].)

The fact the California Legislature has never amended section 401 to reflect similarly explicit language making a defendant criminally liable for aiding, advising or encouraging an attempted suicide is strong evidence of its intent to limit the statute to situations in which the suicide victim actually dies.

extent may a defendant be found guilty of an *attempt* to commit the crime of deliberately aiding, advising or encouraging another to commit suicide?

By statute, "[a]n attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a; see *People v. Swain, supra,* 12 Cal.4th at pp. 603-605 [specific intent to commit target crime and direct, ineffectual act towards its commission are both required for conviction of attempt]; *People v. Dillon* (1983) 34 Cal.3d 441, 454-455 [194 Cal.Rptr. 390, 668 P.2d 697] [attempt requires intent and overt act directed towards immediate consummation of the target offense, but does not require proof of actual element of offense attempted]; 1 Witkin & Epstein, Cal. Criminal Law, *supra,* Elements, § 53, pp. 262-263.) It is fundamental that "[a]ny person may be convicted of an attempt to commit a crime"; by extension, a defendant may be found guilty of an attempt to commit an offense necessarily included in that with which he or she has been charged and is on trial. (§§ 663, 1159.)[10] The punishment for an attempt bears some lesser relation to the punishment—generally one-half the amount—which would be imposed for commission of the completed offense. (§ 664.)[11]

As seen, section 401 is not a crime of solicitation. In order to convict a defendant of the crime defined by section 401, it must be shown that the intended victim actually accomplished a suicide. If the intended victim does not in fact commit suicide, no conviction under section 401 may lie. In view of this fact, neither the legislative history of the statute nor the underlying public policy reasons for imposing criminal liability on aiding, advising or encouraging a suicide would require or indeed justify treating

---

[10]Section 663 provides: "Any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was perpetrated by such person in pursuance of such attempt, unless the Court, in its discretion, discharges the jury and directs such person to be tried for such crime."

Section 1159 provides: "The jury, or the judge if a jury trial is waived, may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense."

[11]Section 664 provides in pertinent part: "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished where no provision is made by law for the punishment of those attempts, as follows:

"(a) If the crime attempted is punishable by imprisonment in the state prison, the person guilty of the attempt shall be punished by imprisonment in the state prison for one-half the term of imprisonment prescribed upon a conviction of the offense attempted. . . .

"(b) If the crime attempted is punishable by imprisonment in a county jail, the person guilty of the attempt shall be punished by imprisonment in a county jail for a term not exceeding one-half the term of imprisonment prescribed upon a conviction of the offense attempted.

"(c) If the offense so attempted is punishable by a fine, the offender convicted of that attempt shall be punished by a fine not exceeding one-half the largest fine which may be imposed upon a conviction of the offense attempted."

this crime differently than any other crime—such as homicide, assault or robbery—in which a failure to *complete* the crime may yet be chargeable as a criminal *attempt.*

We thus have no difficulty concluding that a defendant may be convicted of an *attempt* to commit the crime defined by section 401 of deliberately aiding, advising or encouraging another to commit suicide, whether or not the intended victim actually perished. As with any criminal attempt, the essential elements of this crime are a *specific intent* to commit the crime, and a direct *but ineffectual* act done towards its commission. Thus, in the case of attempted violation of the crime at issue, conviction would require proof of (1) a specific intent to aid, advise, encourage and cause another person actually to commit suicide; and (2) a direct but ineffectual act done towards bringing about the suicide. (*People v. Dillon, supra,* 34 Cal.3d at pp. 454-455; 1 Witkin & Epstein, Cal. Criminal Law, *supra,* Elements, § 53, pp. 262-263; cf. *In re Joseph G., supra,* 34 Cal.3d at pp. 435-437; *Donaldson v. Lungren, supra,* 2 Cal.App.4th at p. 1625; *McCollum v. CBS, Inc., supra,* 202 Cal.App.3d at p. 1007.)

This approach solves the concerns articulated by respondent regarding the anomaly of making the criminal culpability of a person who deliberately aids, advises or encourages another to commit suicide dependent on whether or not the intended suicide victim dies. As appellant himself concedes, a defendant's specific intent to aid, advise or encourage a suicide is the same, regardless of whether the victim lives or dies. To quote appellant's supplemental brief, "[t]he success or failure of the suicide attempt cannot alter the defendant's pre-attempt specific intent." Regardless of whether section 401 itself criminalizes aiding and abetting an attempted but unaccomplished suicide, the specific intent to bring about another's suicide is an essential element of both the crime defined by that statute and an attempt to commit that same crime. By focusing on the attempt of the *defendant,* rather than that of the would-be victim of suicide, we need not rewrite section 401 in order to avoid the inequitable result of allowing a person who intentionally aids, advises or encourages an attempted suicide to escape criminal liability simply because the intended victim did not actually die.[12]

Significantly, in his supplemental briefing submitted at our request, appellant appears to concede that "a defendant may be guilty of an attempt to aid

---

[12]In distinguishing between aiding, advising or encouraging an attempted suicide and attempted aiding, advising or encouraging of a suicide, this court is not engaged in word games or some arcane academic exercise. Aside from our concern for the importance of interpreting the words of a statute as written and avoiding the extension of criminal liability beyond that clearly set forth by the Legislature, the distinction is highly significant with respect to the punishment imposed on different offenders in the real world. As a practical matter, punishment for an attempt is significantly less than that imposed on the commission of a completed crime. (§ 664.)

a suicide if the victim lives . . . , but *only* if the defendant had the required specific intent *and* provided a lethal instrumentality." Appellant goes on to reject the applicability of this concession to the facts of his case, on the grounds the Nytol with which he supplied Christine was insufficiently lethal to constitute an instrument of suicide. As appellant correctly points out, there is no evidence in the record that the amount of Nytol pills ingested by Christine constituted a means by which she could have killed herself. Indeed, there is no evidence in the record to show whether Nytol *can* be lethal, in any amount. On this basis, appellant insists not only that there is no evidence to support his conviction under section 401 as a matter of law, but that he cannot be guilty even of an *attempt* to commit the crime of aiding, advising or encouraging a suicide.

Appellant is wrong. As previously noted, conviction under section 401 does require a finding that the defendant had some direct, affirmative participation in the events leading up to the commission of the final overt act of suicide. Many cases have noted that this active and direct participation in bringing about the suicide *may* be demonstrated by proof the defendant furnished the victim with some lethal means actually capable of causing death. (*In re Joseph G., supra,* 34 Cal.3d at pp. 436; *People v. Matlock, supra,* 51 Cal.2d at p. 694; *Donaldson v. Lungren, supra,* 2 Cal.App.4th at p. 1625; *McCollum v. CBS, Inc., supra,* 202 Cal.App.3d at p. 1007; *Bouvia v. Superior Court, supra,* 179 Cal.App.3d at p. 1145.) However, the only requirement for conviction in a section 401 case is that the defendant be shown to have actively and intentionally participated in the events leading to a *completed* suicide; there is no absolute prerequisite that the defendant *also* be shown to have supplied the victim with the actual instrumentality of suicide. By the same token, there is certainly no requirement that a defendant charged with an *attempt* to commit the crime of aiding, advising or encouraging another to commit suicide be shown to have supplied the victim with a lethal means actually capable of inflicting death. Indeed, in the case of an attempt, all that is required is that the defendant actually *intend* the suicide, and participate in bringing it about in such a way as to make the intended suicide *apparently possible.*

 "[W]hen commission of the substantive offense is factually impossible, a defendant may be convicted of an *attempt* to commit the offense when it is proven that he had the specific intent to commit the offense and did those acts he believed necessary to consummate it but failed to commit the statutory offense because, unknown to the actor, one or more of the essential elements of the offense were lacking." (*People v. Meyer* (1985) 169 Cal.App.3d 496, 505 [215 Cal.Rptr. 352].) Thus, a defendant may be convicted of an attempt to commit a crime where there is sufficient evidence to

demonstrate that the means used by the defendant, together with the surrounding circumstances, made the intended crime *apparently possible.* " 'If there is an apparent ability to commit the crime in the way attempted, the attempt is indictable, although, unknown to the person making the attempt, the crime cannot be committed, because the means employed are in fact unsuitable, or because of extrinsic facts, such as the nonexistence of some essential object, or an obstruction by the intended victim, or by a third person.' " *(People v. Siu* (1954) 126 Cal.App.2d 41, 43-44 [271 P.2d 575] [upholding conviction for attempted possession of narcotics, where defendant was in possession of white talcum powder he believed was heroin]; see also *People v. Camodeca* (1959) 52 Cal.2d 142, 147 [338 P.2d 903] ["Although the law does not impose punishment for guilty intent alone, it does impose punishment when guilty intent is coupled with action that would result in a crime but for the intervention of some fact or circumstance unknown to the defendant"]; *People v. Grant* (1951) 105 Cal.App.2d 347, 356 [233 P.2d 660] [approving instruction that " '[i]t is immaterial whether or not the crime attempted was impossible of completion if you find that it was apparently possible of completion to the defendant so acting with the necessary intent' "]; and cases collected at 1 Witkin & Epstein, Cal. Criminal Law, *supra,* Elements, § 61, pp. 269-271.)

 Applying these principles to the facts in the record before us, it is clear there was sufficient evidence to find appellant guilty of an *attempt* to violate section 401 by deliberately aiding, advising and encouraging another person to commit suicide. The evidence, construed in a light most favorable to the prosecution, shows that appellant encouraged the victim to commit suicide; advised her to do so by ingesting up to 100 Nytol pills all at once; and actively participated in her actual suicide attempt by helping her to obtain the pills, combining at least two bottles of pills together, and then handing them to her. But for the fact that—unknown to either appellant or the victim—the intended means of suicide was not lethal, appellant would clearly be guilty of the crime of aiding, advising and encouraging another to commit suicide under section 401. Under the circumstances presented, he is guilty of the lesser offense of *attempted* aiding, advising and encouraging of a suicide. (§§ 21a, 401, 1159.) This matter must therefore be reversed and remanded to the trial court for modification of the judgment and disposition to reflect a finding of attempted violation of section 401.

### LIMITATION OF CROSS-EXAMINATION OF PROSECUTION WITNESS

 Appellant also contends that his constitutional rights under the due process and confrontation clauses of the federal and state Constitutions were violated by trial court's rulings limiting his cross-examination of Christine

regarding her relationship with her parents and their attitude toward appellant. This contention is without merit.

It is well established that a trial court is vested with wide discretion in determining relevance and weighing the prejudicial effect of evidence against its probative value. Evidentiary rulings will not be overturned on appeal in the absence of a clear abuse of that discretion, upon a showing that the trial court's decision was palpably arbitrary, capricious, or patently absurd, and resulted in injury sufficiently grave as to amount to a miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10 [82 Cal.Rptr.2d 413, 971 P.2d 618]; *People v. Cooper* (1991) 53 Cal.3d 771, 816-817 [281 Cal.Rptr. 90, 809 P.2d 865]; *People v. Robbins* (1988) 45 Cal.3d 867, 880-881 [248 Cal.Rptr. 172, 755 P.2d 355]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314-1315 [97 Cal.Rptr.2d 727]; *People v. Brown* (1993) 17 Cal.App.4th 1389, 1396 [22 Cal.Rptr.2d 14]; *People v. Adams* (1980) 101 Cal.App.3d 791, 799 [162 Cal.Rptr. 72]; *People v. Cordova* (1979) 97 Cal.App.3d 665, 670 [158 Cal.Rptr. 852].)

Under the Sixth Amendment to the United States Constitution, a defendant has the constitutional right to confront the witnesses against him and to cross-examine his accusers. A criminal defendant states a violation of the confrontation clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show bias on the part of the witness, and thereby to expose facts from which the jury could appropriately draw inferences relating to the reliability of the witness. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679-680 [106 S.Ct. 1431, 1435-1436, 89 L.Ed.2d 674]; *Davis v. Alaska* (1974) 415 U.S. 308, 318 [94 S.Ct. 1105, 1111, 39 L.Ed.2d 347].)

Nevertheless, a trial court retains broad discretion over the conduct of trial. In the context of its duty to supervise the questioning of trial witnesses, it has wide discretion to limit questions that are marginally relevant and cumulative. Although the exposure through cross-examination of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of confrontation, the confrontation clause does not prevent a trial court from imposing reasonable limits on a defense counsel's inquiry into the potential bias of a prosecution witness. (*People v. Cooper, supra,* 53 Cal.3d at pp. 816-817.) "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall, supra,* 475 U.S. at pp. 678-679 [106

S.Ct at p. 1435]; see also *Taylor v. Illinois* (1988) 484 U.S. 400, 410 [108 S.Ct. 646, 653, 98 L.Ed.2d 798] ["The accused does not have an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence."]; *Crane v. Kentucky* (1986) 476 U.S. 683, 690 [106 S.Ct. 2142, 2146, 90 L.Ed.2d 636] ["we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted"].)

The confrontation clause simply guarantees an *opportunity* for effective cross-examination; it does not assure a chance to cross-examine in whatever way, and to whatever extent, the defense might wish. (*Delaware v. Van Arsdall, supra,* 475 U.S. at pp. 679-680 [106 S.Ct. at pp. 1435-1436]; *Delaware v. Fensterer* (1985) 474 U.S. 15, 20 [106 S.Ct. 292, 294-295, 88 L.Ed.2d 15]; *Davis v. Alaska, supra,* 415 U.S. at pp. 315-316 [94 S.Ct. at pp. 1109-1110].) As long as the cross-examiner has the opportunity to place the witness in his or her proper light, and to put the weight of the witness's testimony and credibility to a reasonable test which allows the fact finder fairly to appraise it, the trial court may permissibly limit cross-examination to prevent undue harassment, expenditure of time, or confusion of the issues. (*Davis v. Alaska, supra,* 415 U.S. at p. 318 [94 S.Ct. at p. 111]; *Evans v. Lewis* (9th Cir. 1988) 855 F.2d 631, 634; *Steele v. Perez* (7th Cir. 1987) 827 F.2d 190, 193-194.) Thus, a trial court's exercise of discretion to exclude evidence does not implicate or infringe a defendant's federal constitutional right to confront the witnesses against him, unless the prohibited cross-examination might reasonably have produced a significantly different impression of the witness's credibility. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611 [25 Cal.Rptr.2d 390, 863 P.2d 635]; *People v. Cooper, supra,* 53 Cal.3d at pp. 816-817; *People v. Jennings* (1991) 53 Cal.3d 334, 372 [279 Cal.Rptr. 780, 807 P.2d 1009].)

 Christine was the prosecution's principal witness against appellant. The entire defense cross-examination was aimed at exposing inconsistencies in her statements and actions, and attacking her credibility. Among other things, defense counsel cross-examined Christine at length regarding her motivations in pressing charges against appellant. Because Christine's handwritten suicide note blamed her parents and expressed friendship and affection for appellant, defense counsel sought to question her about her apparently sudden and newfound bias against appellant.

Appellant complains that in the course of Christine's cross-examination, the trial court sustained several relevance objections by the prosecution to defense questions peripherally related to these issues. Thus, defense counsel

was not permitted to ask Christine whether she had told her parents she "hated them"; if her parents were "angry" with her about her suicide attempt; whether her parents "believe basically what you told them" about it being appellant's "fault as to what you did"; if her parents had "made it clear to you they believe it is [appellant's] fault"; whether she was aware of any letters by her parents to the juvenile court regarding appellant's responsibility for the attempted suicide; and if she was living at home with her parents at the time of trial.

On the other hand, the record shows that during the lengthy defense cross-examination of Christine, the trial court *overruled* numerous other prosecution objections to questions designed to probe the issues of Christine's credibility, bias and motive. Thus, the trial court specifically overruled objections to questions which permitted the defense to elicit Christine's testimony that her parents were "upset" with her about her behavior before her attempted suicide; she and appellant were both "kind of ignorant" about the means she used to attempt suicide; she "lied" to the police by telling them appellant purchased two bottles of pills when in fact she "stole" one bottle herself; she wrote the suicide note because she wanted her parents to feel bad and that "they were responsible" for her attempted suicide; her first conversation with her parents took place three days after her hospital stay; and she subsequently "indicated" to her parents that her attempted suicide would not have occurred if not for appellant.

Thus, the record shows the trial court *permitted* defense counsel to question Christine extensively about her troubled relationship with her parents, their attitude toward the case, her discussions with them about appellant's role in the attempted suicide, and her subsequent efforts to reconcile with them. As a result, appellant was specifically able to demonstrate, among other things, that it was only after going to the hospital and subsequently speaking with her parents that Christine began to blame appellant for her suicide attempt. Because of the extensive questions defense counsel was able to ask without objection, appellant was fully able to explore the issues of whether Christine was worried that her parents were upset with her for attempting suicide and blaming them in the suicide note, and her consequent motivation to blame appellant falsely in order to appease her parents both for her suicide attempt and for the inflammatory statements in her suicide note. In view of this record, the specific questions as to which objections were sustained were clearly cumulative, repetitive and only marginally relevant. We conclude there was no violation of appellant's right to confront the prosecution's chief witness against him, and the trial court did not abuse its broad discretion in sustaining the particular objections here at issue.

## Disposition

The orders sustaining the allegations of the petition and declaring appellant a ward of the court are reversed and remanded, with orders that the findings be modified to reflect a true finding of attempted violation of section 401, and for further dispositional proceedings not inconsistent with this opinion. In all other respects, the judgment is affirmed.

Corrigan, J., and Parrilli, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 16, 2002.